No. 36.—HAWKINS H. NUNN *vs.* THE STATE of Georgia.

An indictment, founded upon a presentment of the grand jury, need not be sent again before that body for its action thereon.

It is the duty of the clerk to spread out in *full* upon the minutes of the court, every presentment of the grand jury.

A law which merely inhibits the wearing of certain weapons in a *concealed manner* is *valid*. But so far as it cuts off the exercise of the right of the citizen altogether to *bear arms*, or, under the color of prescribing the *mode*, renders the right itself useless—it is in conflict with the Constitution, and *void*.

This was a bill of indictment, founded upon a presentment of a grand jury at Sumpter Superior Court, against the plaintiff in error, for a high misdemeanor, for having and keeping about his person, and elsewhere, a pistol, the same not being such a pistol as is known and used as a horseman's pistol, under an act of the General Assembly of the State of Georgia, entitled " An Act to guard and protect the citizens of this State against the unwarrantable and too prevalent use of deadly weapons," assented to on the 25th December, 1837 ; upon which bill was endorsed by the solicitor-general, that the same was " founded on the presentment of a grand jury."—The bill of indictment, so made out and endorsed, as founded upon presentment, &c., had not at any time been sent out to a grand jury, and found a true bill : that the only evidence of there having been a presentment made in said case was a paper, purporting to be a presentment of the grand jury for the November Term, 1844 , of said court, and an entry made upon the minutes of the court for the said term, as follows, to wit :

" The State
vs           }   HIGH MISDEMEANOR."
" Hawkins H. Nunn

And the names of the grand jurors inserted in the said paper, purporting to be the presentment, were the names of the grand jurors of said term.

At May Term, 1846, of said Superior Court, the said bill of indictment came on to be tried before Judge Warren ; when the plaintiff in error having been arraigned, and plead not guilty by his counsel, moved to quash the indictment on the following grounds :

1st. That the before-recited statute of the State of Georgia, assented to on the 25th of December, 1837, under which said indictment was found, is contrary to, and in violation of, the Constitution of the United States of America.

2d. That said statute is contrary to, and in violation of, the Constitution of the State of Georgia.

3d. That the indictment does not show and charge that the defendant below carried the pistol, with the having and keeping of which he is charged, secretly.

4th. That there is no sufficient legal evidence of record upon the minutes of the court, at the term at which the presentment, upon which said indictment is framed, purports to have been made, that said presentment ever was in fact made by the grand jury, or delivered into court.

5th. That the bill of indictment was never sent before any grand jury for action upon it.

6th. That said statute is void for uncertainty, and for the absurdity and contradiction in its different provisions.

All of which said grounds were overruled by the court below ; and the plaintiff in error excepted.   George Dykes, a witness for the State, was then introduced, and proved that on the 4th day of November, 1844, the plaintiff in error, in said county of Sumpter, had a pistol in his hand, which was not a horseman's pistol, but a breast pistol.   And thereupon, after argument, the judge of the court below charged the jury that the aforesaid statute was constitutional and of force, and if they believed that the defendant had the pistol, they should bring in a verdict of guilty.   To which the plaintiff in error also excepted.

Dudley and Crawford and T. C. Sullivan, for the plaintiff in error,

Contended, 1st. That the act of 1837, under which the indictment in this case was framed, is contrary to the Constitution of the U. S.—*Prin. Dig.* 900, *2d Amendment*; *Patrol law Prin. Dig.* 774 ; *Militia Law U. S. Ing. Dig.* 596 ; *Ib. Georgia, Prin. Dig.* 588 ; 4 *Wheaton* 2*d Condensed Reps. Supreme Ct.* 326 ; 9 *Wheat.* 562 ; 1 *Ala. Rep. New Series*, 614 ; 2*d Litt.* 90 ; 3 *Blackf'd* 229.

2d. That said act is contrary to the Constitution of the State of Georgia.— *Prin. Dig.* 904 ; 17 *sec.* 1*st art. Constitution.*

3d. The indictment does not charge that the pistol was carried secretly.— *Pamphlet Laws of* 1837, p. 90 ; *Prin. Dig.* 774.

4th. That there was no sufficient legal evidence that the presentment had been made and delivered into court by the grand jury.   Our statute requires the clerk to keep minutes of all the proceedings in the court, (*Prin. Dig.* 428,) and presentments should either be entered at full length on the minutes, or such an entry should be made as to show conclusively that the presentment had been made. Such an entry as made in this case, to wit : " The State vs. Hawkins H. Nunn, high misdemeanor," is insufficient.

5th. That the indictment was never acted on by the grand jury.—*Prin. Dig.* 659 ; 14 *division* 5*th sec.* 3 *Blk. Com.*, 4 *Com. Dig.* 645, *note u.*; 1 *Chit. Cr. Law* 162–3 ; *Stephen Crim. Law.*

6th. Said statute is void for its absurdities and conflicting provisions.—*Pamphlet Laws*, 1837, page 90.

Wm. J. Patterson, Sol. Gen. for the State.

Before the court will declare an act of the Legislature unconstitutional, a case must be presented in which there can be no rational doubt.—1 *Ala. Rep.* 612, *New Series*; 1 *Cowen Rep.* 550; 1 *Com. Law Rep.* 146. There was sufficient legal evidence of the presentment.—4 *Phillips' Ev.* 1068-1074; *Roscoe's Crim. Ev.* 186. It was not necessary for the grand jury to act upon the bill of indictment, predicated as it was on a special presentment.—1 *Chit. Crim. Law,* 162; 4 *Blk. Com.* 301.

*By the Court.*—Lumpkin, Judge.

This was an indictment for a high misdemeanor, founded upon the presentment of a grand jury in Sumpter Superior Court.

At May term, 1846, the defendant, being arraigned, pleaded not guilty, and moved to quash the proceeding on the following grounds, to wit: 1st and 2d. Because the act of 1837, under which he was prosecuted, was contrary to the Constitution of the United States and of the State of Georgia.

3d. Because the indictment does not show and charge that the defendant (below) carried the pistols *secretly,* with the having and keeping of which he is charged in the indictment.

4th. Because there is no sufficient evidence of record that said presentment ever was made by a grand jury, or delivered into court.

5th. Because the bill of indictment was never sent before any grand jury for action upon it.

6th. Because the act of 1837 is void for uncertainty, and the absurdity and contradictions in its different provisions.

All these objections being overruled by Judge Warren, they are now presented in the bill of exceptions for the determination of the Supreme Court.

The view taken by us of the first grounds submitted to our consideration, will dispose finally of this case: still, as there are several important points of practice contained in some of the other grounds, and which are properly before us, and have been fully discussed by counsel, we deem it advisable to express our opinion respecting them.

In the opinion of this court, it is not necessary that an indictment, founded upon presentments, should be referred to the grand jury for the further action of that body. A presentment is the notice taken already by the grand jury of any offence, from their own knowledge or observation, and into which it is their duty to inquire. And although the party cannot be put to answer it until it is delivered into court, and an indictment framed thereon by the proper officer, still, it is never sent back to the grand inquest to be acted on a second time.—*Burn's J. Presentment;* 1 *Chitty's Crim. Law,* 163. Neither is it indispensably necessary that the *whole* presentment be spread upon the minutes of the court, with the action of the jury thereon. The endorsement on the paper itself, of file in the office, or the signatures of the body, or of the foreman, in the name of himself and his fellows, aided by the testimony of the solicitor and clerk, would be sufficient. It is, however, a highly useful and safe practice, and a duty required to be performed, no doubt, by the law, that the whole presentment be put upon the minutes.

It is always with unfeigned reluctance that we approach a question involving the constitutionality of a state law. It is made our duty, howev-

er, in the present case, and we should be unworthy of the exalted station we occupy, if we were to shrink from its performance.

There are certain fundamental principles appertaining to questions of this character, which should never be overlooked. I will state a few of them, and then proceed to examine the statutes in controversy.

It ought seldom or ever to be decided, in *a doubtful case*, that a law is void for its repugnance to the Constitution. And it is not on slight implications and vague conjectures that the Legislature is to be pronounced to have transcended its powers. On the contrary, the opposition between the law and the Constitution should be such, that the judges feel a clear and strong conviction of their incompatibility with each other. The presumption is in favor of every legislative act, and the whole burden of proof lies on him who denies its constitutionality. These doctrines have been repeatedly advanced by the highest judicatory in the nation.—*See* 6 *Cranch,* 128 ; 4 *Wheaton,* 625 ; 12 *Ib.* 436.

The act of 1837 was passed to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons.*

Section 1st enacts, " that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere, any of the herein-after-described weapons, to wit : Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence ; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols," &c.

Section 2d, prescribes the punishment.

Section 3d, makes it the duty of all civil officers to be vigilant in carrying the act into full effect, &c.

Section 4th, disposes of the fines arising under the act, and exempts sheriffs and other officers, therein named, from its provisions while in the actual discharge of their respective duties. It then declares, *that no person or persons shall be found guilty of violating the before-recited act, who shall openly wear, externally, bowie-knives, dirks, tooth-picks, spears, and which shall be exposed plainly* to view. It allows venders or any other persons to sell any of the aforesaid weapons,which they then owned or had on hand, " till the first day of March next ensuing its date."

There is great vagueness in the wording of this statute. It would seem to have been the intention of the Legislature to make the *proviso* in the 4th section as broad as the enacting clause in the 1st. But such is not the fact. Pistols and sword-canes are inserted in the 1st, and omitted in the 4th section ; and tooth-picks are mentioned for the first time in the *proviso*, in the 4th section. Were we disposed to criticise language, an ample field is here spread out before us. It might be insisted, and with much plausibility, that even *sheriffs*, and *other officers* therein enumerated, might be convicted for *keeping*, as well as carrying, any of the forbidden weapons, while not in the actual discharge of their respective duties. And yet it is hardly to be supposed, that it was expected of sheriffs, constables, marshals, overseers and patrols, to procure a new supply of arms for each successive service, and *throw them away* when it was accomplished : for they dare not sell or otherwise dispose of them after March, 1838. It is the plain and literal meaning of the act, too,

that no person should be found guilty of selling or offering to sell, or keeping or having about their persons, or elsewhere, bowie or any other kind of knives, pistols, dirks, sword-canes, or spears, *who shall openly wear, externally,* bowie-knives, dirks, tooth-picks, and spears, and which shall be exposed plainly to view. But this would be an absurdity too glaring to impute to the wisdom of that body.

What, then, is the obvious purpose of the Assembly, to be deduced from the whole act, deviating a little, as we are at liberty to do, from the literal meaning of its language, and looking to the *subject matter,* to which the words are always supposed to have regard, and the reason and spirit of the act ? It *prohibits bowie-knives, dirks, spears, (and it may be, tooth-picks,) from being sold, or secretly kept about the person, or elsewhere ; and it forbids, altogether, the use, or sale, or keeping, of sword-canes, and pistols, save such pistols as are known and used as horseman's pistols,* &c. Now, the defendant, Hawkins H. Nunn, was indicted and convicted of a high misdemeanor, " for *having and keeping about his person, and elsewhere, a pistol, the same not being such a pistol as is known and used as a horseman's pistol."*

It is not pretended that he carried his weapon *secretly,* but it is charged as a crime, that he had and kept it about his person, and elsewhere. And this presents for our decision the broad question, is it competent for the Legislature to deny to one of its citizens this privilege ? *We think not.*

This question has occasionally come before the courts of the Union for adjudication. In *Bliss* vs. *The Commonwealth,* (2 *Littell's Rep.* 90,) the defendant was indicted, on the act of the Legislature " to prevent persons from wearing concealed arms." It provides that any person in the Commonwealth, who shall, after its passage, " wear a pocket-pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when traveling on a journey, shall be fined in any sum not less than one hundred dollars ; which may be recovered in any court having jurisdiction of like sums, by action of debt, or on presentment of a grand jury."

The indictment, in the words of the act, charges Bliss with having *worn, concealed as a weapon, a sword in a cane.*

Bliss was found guilty of the charge, and a fine of one hundred dollars assessed by the jury, and judgment was thereon rendered by the court. To reverse that judgment, Bliss appealed to the Supreme Court, by a majority of which (Judge Mills dissenting) the judgment was reversed.

The argument in this case turned mainly on the 23d section of the 10th article of the Constitution of Kentucky, which provides " that the right of the citizens to bear arms in defence of themselves and the State, shall not be questioned."

The attorney-general did not contend that it would be competent for the Legislature, by the enactment of any law, to prevent the citizens from bearing arms ; but a distinction was taken between a law prohibiting the exercise of the right, and a law merely regulating the manner of exercising that right. And while the former was admitted to be incompatible with the Constitution, it was insisted that the latter was not so. And under that distinction, and by assigning the act in question a place in the latter description of laws, its consistency with the Constitution was attempted to be maintained.

But the court say, " that the provisions of the act in question do not import an entire destruction of the right, will not be controverted ; for though the citizens are forbid wearing weapons, concealed in the manner described in the act, they may nevertheless bear arms in any admissible form. *But to be in conflict with the Constitution, it is not essential that the act should contain a prohibition against bearing arms, in every possible form. It is the right to bear arms, that is secured by the Constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the Constitution.*"

" If, therefore, the act in question imposes any restraint on the right, immaterial what appellation may be given to the act, whether it be an act regulating the manner of bearing arms, or any other, the consequence in reference to the Constitution is precisely the same, and its collision with that instrument equally obvious."

" And can there be entertained a reasonable doubt, but the provisions of the act import a restraint on the right of the citizens to bear arms ? The court apprehends not. The right has no limits, short of the moral power of the citizens to exercise it, and in *fact consists of nothing else but the liberty.* Diminish that liberty, therefore, and you necessarily restrain the right ; and such is the diminution and restraint which the act in question most indisputably imports, by prohibiting the citizens bearing weapons. In truth, the right of the citizens to bear arms has been as directly assailed by the provisions of this act, as though they were forbid carrying guns on their shoulders, swords in scabbards, or when in conflict with an enemy, were not allowed the use of bayonets. And, if the act be consistent with the Constitution, it cannot be incompatible with that instrument for the Legislature by successive enactments to entirely cut off the exercise of the right of the citizens to bear arms. For in principle there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing of such as are exposed ; and, ift he former be unconstitutional, the latter must be so likewise."

The conclusion at which the court arrived was, *that an act to prevent persons from wearing even concealed weapons is unconstitutional and void.*

In the *State* vs. *Reid*, (1 *Ala. Rep.* 612,) the same question came up, but was differently adjudged ; thus verifying the old truth, " *tot homines, quot sententiæ,*"—so many men, so many opinions !

By the first section of the act of Alabama (passed 1838–1839) it is declared, " that if any person shall carry concealed about his person any species of fire-arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case ; and be imprisoned for a term not exceeding three months, at the discretion of the judge of said court."

Under this section, the defendant was indicted in the Circuit Court of Montgomery, for carrying concealed about his person a certain species of fire-arms, called a pistol, contrary to the form of the statute. The defendant pleaded *not guilty*, and insisted, that the law under which he was prosecuted, was contrary to the constitution of Alabama, which declares, " that every citizen has a right to bear arms in defence of himself and the State."—23*d* sect. 1*st art. of the Constitution.*

Collier, Chief Justice, says : " The question recurs, does the act " to suppress the evil practice of carrying weapons secretly," trench upon the constitutional rights of the citizen ? *We think not.*

The Constitution, in declaring that every citizen has the right to bear arms, in defence of himself and the State, has neither expressly nor by implication denied to the Legislature the right to enact laws in regard to *the manner* in which arms shall be borne.

" We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of *regulating*, amounts to a *destruction* of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional. But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

The same point arose in the case of *The State* vs. *Mitchell.*—3 *Black. Rep.* 229. There the defendant was indicted under a statute of Indiana, which is as follows : " Every person, not being a traveler, who shall wear or carry a dirk, pistol, sword in a cane, or other dangerous weapon, *concealed*, shall, upon conviction thereof, be fined in any sum not exceeding one hundred dollars."—*Laws of Indiana*, ed. of 1831, p. 192.

The court decided that this act was not contrary to the Constitution of that State, which declares that " the people have a right to bear arms for the defence of themselves and the State."

It is true, that these adjudications are all made on clauses in the State Constitutions ; but these instruments confer no *new rights* on the people which did not belong to them before. When, I would ask, did any legislative body in the Union have the right to deny to its citizens the privilege of keeping and bearing arms in defence of themselves and their country ?

If this right, " inestimable to freemen," has been guarantied to British subjects, since the abdication and flight of the last of the Stuarts and the ascension of the Prince of Orange, did it not belong to our colonial ancestors in this western hemisphere ? Has it been a part of the *English* Constitution ever since the bill of rights and act of settlement ? and been forfeited here by the substitution and adoption of our own Constitution ? No notion can be more fallacious than this ! On the contrary, this is one of the fundamental principles, upon which rests the great fabric of civil liberty, reared by the fathers of the Revolution and of the country. And the Constitution of the United States, in declaring that the right of the people to keep and bear arms, should not be infringed, only reiterated a truth announced a century before, in the act of 1689, " to extend and secure the rights and liberties of English subjects "—whether living 3,000 or 300 miles from the royal palace. And it is worthy of observation, that both charters or compacts look to the same *motive*, for the irrespective enactments. The act of 1 *William and Mary*, declares that it is against law to raise or keep a standing army in the kingdom, in time of peace, without the consent of Parliament, and therefore places arms in

the hands of the people ; and our Constitution assigns as a reason why this right shall not be interfered with, or in any manner abridged, that the free enjoyment of it will prepare and qualify *a well-regulated militia,* which are necessary to the security of a free State.

I am aware that it has been decided, that this, like other amendments adopted at the same time, is a restriction upon the government of the United States, and does not extend to the individual States. The court held otherwise, however, in the case of the *People* vs. *Goodwin,* (18 *John. Rep.* 200) and Chief Justice Spencer, who delivered its opinion, says : " The defendant's counsel rely principally on the fifth article of the amendments to the Constitution of the *United States,* which contains this provision : ' *Nor shall any person be subject, for the same offence, to be twice put in jeopardy of life or limb.*' It has been urged by the prisoner's counsel, that this constitutional provision operates upon State courts—*proprio vigore.* This has been denied on the other side. I *am inclined* to the opinion, that the article in question does extend *to all judicial tribunals,* whether constituted by the Congress of the United States or the States individually. The provision is general in its nature and unrestricted in its terms ; and the sixth article of the Constitution declares, that that Constitution shall be the supreme law of the land, and the judges in every State shall be bound thereby, any thing in the constitution or laws of any State to the contrary notwithstanding. *These general and comprehensive expressions extend the provisions of the Constitution of the United States, to every article which is not confined by the subject matter to the national government, and is equally applicable to the States.* Be this as it may, the principle is undeniable, that no person can be twice put in jeopardy of life or limb for the same offence."

The language of the *second* amendment is broad enough to embrace both Federal and State governments—nor is there anything in its terms which restricts its meaning. The preamble which was prefixed to these amendments shows, that they originated in the fear that the powers of the general government were not sufficiently limited. Several of the States, in their act of ratification, recommended that further restrictive clauses should be added. And in the first session of the first Congress, *ten of these* amendments having been agreed to by that body, and afterwards sanctioned by three-fourths of the States, became a part of the Constitution. But admitting all this, does it follow that because the people refused to delegate to the general government the power to take from them the right to keep and bear arms, that they designed to rest it in the State governments ? Is this a right reserved to the *States* or to *themselves* ? Is it not an unalienable right, which lies at the bottom of every free government ? We do not believe that, because the people withheld this arbitrary power of disfranchisement from Congress, they ever intended to confer it on the local legislatures. This right is too dear to be confided to a republican legislature.

Questions under some of these amendments, it is true, can only arise under the laws and Constitution of the United States. But there are other provisions in them, which were never intended to be thus restricted, but were designed for the benefit of every citizen of the Union in all courts and in all places ; and the people of the several States, in ratifying them in their respective State conventions, have virtually adopted them

as beacon-lights to guide and control the action of their own legislatures, as well as that of Congress. If a well-regulated militia is *necessary* to the *security* of the State of Georgia and of the United States, is it competent for the General Assembly to take away this security, by disarming the people ? What advantage would it be to tie up the hands of the national legislature, if it were in the power of the *States* to destroy this bulwark of defence ? In solemnly affirming that a well-regulated militia is necessary to the *security* of a *free State*, and that, in order to train properly that militia, the unlimited right of the *people* to *keep* and *bear* arms shall not be impaired, are not the sovereign people of the State committed by this pledge to preserve this right inviolate ? Would they not be recreant to themselves, to free government, and false to their own vow, thus voluntarily taken, to suffer this right to be questioned ? If they hesitate or falter, is it not to concede (themselves being judges) that the safety of the States is a matter of indifference ?

Such, I apprehend, was never the meaning of the venerated statesman who recommended, nor of the people who adopted, this amendment.

The right of the people peaceably to assemble and petition the government for a redress of grievances ; to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ; in all criminal prosecutions, to be confronted with the witness against them ; to be publicly tried by an impartial jury ; and to have the assistance of counsel for their defence, *is as perfect under the State as the national legislature, and cannot be violated by either.*

Nor is the *right* involved in this discussion less comprehensive or valuable : " The right of the people to bear arms shall not be infringed." The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree ; and all this for the important end to be attained : the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State. Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this *right*, originally belonging to our forefathers, trampled under foot by Charles I. and his two wicked sons and successors, reestablished by the revolution of 1688, conveyed to this land of liberty by the colonists, and finally incorporated conspicuously in our own *Magna Charta !* And Lexington, Concord, Camden, River Raisin, Sandusky, and the laurel-crowned field of New Orleans, plead eloquently for this interpretation ! And the acquisition of Texas may be considered the full fruits of this great constitutional right.

We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void;* and that, as the defendant has been indicted and convicted for carrying a pistol, without charging that it was done in a concealed manner, under that portion of the statute which entirely forbids its use, the judgment of the court below must be reversed, and the proceeding quashed.