CANADY, J.,
dissenting.
Because Florida’s generally applicable ban on the open carrying of firearms is unjustified on any ground that can withstand even intermediate scrutiny, I dissent. I agree with the majority that “Florida’s Open Carry Law is related to the core of the constitutional right to bear arms for self-defense,” majority op. at 37, but I disagree with the majority’s view that the statute “ ‘substantially relates’ to the stated government purpose of public safety and reducing gun violence,” id. at 39. I therefore would answer the first certified question in the negative. And I would decline to answer the remaining certified questions, which are rendered moot by a negative answer to the first question.
I.
Three elements of the Supreme Court’s reasoning in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), illuminate the constitutional question here. The third element establishes that the Second Amendment right is a right to openly carry firearms.
As the underpinning for its decision invalidating a law prohibiting the possession of handguns in the home, the Court recognized that “[b]y the time of the founding, the right to have arms had become fundamental for English subjects,” id. at 593, 128 S.Ct. 2783, and that the text of the Second Amendment—properly understood in historical context—“guarantee^ the individual right to possess and carry weapons in case of confrontation,” id. at 592, 128 S.Ct. 2783. The Second Amendment right thus encompasses “being armed and ready for offensive or defensive action in a case of conflict with another person.” Id. at 584, 128 S.Ct. 2783 (quoting Muscarello v. United States, 524 U.S. 125, 143, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (Ginsburg, J., dissenting) (quoting Black’s Law Dictio *43 nary 214 (6th ed. 1990))). This is reinforced by the statement in McDonald v. City of Chicago, 561 U.S. 742, 749-50, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), that Heller “held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense.” The “individual right to possess and carry weapons in case of confrontation,” Heller, 554 U.S. at 592, 128 S.Ct. 2783, to “be[ ] armed and ready for offensive or defensive action in a case of conflict with another person,” id. at 584, 128 S.Ct. 2783 (citation omitted), “for the purpose of self-defense,” McDonald, 561 U.S. at 750, 130 S.Ct. 3020, necessarily encompasses the right to carry arms in public. On this point, of course, the majority here does not disagree.
Second, in explaining the historical context bearing on the interpretation of the Second Amendment, Heller observed that “the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.” Heller, 554 U.S. at 626, 128 S.Ct. 2783. Heller used this point to illustrate the broader point that “[fjrom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to keep and bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” Id.
Third, in conjunction with the point regarding the carrying of concealed weapons, Heller recognized that the pre-Civil War case law, which demonstrated “the public understanding of’ the constitutional right to keep and bear arms “in the period after its enactment or ratification,” id. at 605, 128 S.Ct. 2783 (emphasis omitted), interpreted the right as a right to openly carry firearms. The Court characterized the examination of such case law as “a critical tool of constitutional interpretation.” Id. In particular, Heller’s analysis relied on two state supreme court decisions that address the right to open carry—Nunn v. State, 1 Ga. 243 (1846), and State v. Chandler, 5 La.Ann. 489 (1850).
Heller explained that in Nunn “the Georgia Supreme Court construed the Second Amendment as protecting the ‘natural right of self-defence’ and therefore struck down a ban on carrying pistols openly.” Heller, 554 U.S. at 612, 128 S.Ct. 2783 (emphasis omitted) (quoting Nunn, 1 Ga. at 251). Nunn stated that the state statute at issue “is valid”' to the extent that it “seeks to suppress the practice of carrying certain weapons secretly ... inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.” Nunn, 1 Ga. at 251 (emphasis omitted). But Nunn goes on to state “that so much of [the statute], as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void.” Id. (emphasis omitted).
Similarly, Heller relied on Chandler in which
the Louisiana Supreme Court held that citizens had a right to carry arms openly: “This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.”
Heller, 554 U.S. at 613, 128 S.Ct. 2783 (quoting Chandler, 5 La.Ann. at 490). Chandler vindicated a state law prohibiting carrying concealed deadly weapons—that is, a deadly weapon “that does not appear in full open view.” Chandler, 5 La.Ann. at 489. The court observed that the prohibition “became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and. to prevent bloodshed and *44 assassinations committed upon unsuspecting persons.” Id. at 489-90.
The Supreme Court’s examination of Nunn and Chandler constituted a “critical,” Heller, 554 U.S. at 605, 128 S.Ct. 2783, element in Heller’s interpretation of the meaning of the Second Amendment right to keep and bear arms. Amd both cases point strongly to the conclusion that the constitutional right is best understood historically as a specific right to carry arms openly. The Court’s broad characterization of the Second Amendment right as “the right to keep and bear arms for the purpose of self-defense,” McDonald, 561 U.S. at 749-50, 130 S.Ct. 3020, cannot be detached from this historical context. For example, the right cannot be reduced to a right to carry long-guns based on the supposition that a broad prohibition of carrying handguns would not prevent the carrying of arms “for self-defense.” Heller, 554 U.S. at 629, 128 S.Ct. 2783. Given the history-centered reasoning employed by Heller, it is sensible to “refer to the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified.” Michael H. v. Gerald D., 491 U.S. 110, 127 n.6, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). “[A]dopt[ing] the most specific tradition as the point of reference” helps avoid “arbitrary decisionmaking” by judges. Id. And, of course, the “most specific tradition,” id. in this context is the tradition—exemplified in Nunn and Chandler—vindicating the right to openly carry firearms.[19]
II.
The Florida statute challenged here collides with the Second Amendment right as understood in Heller. And the majority’s attempt to justify the law’s interference with Second Amendment rights rests on a very slender reed. The justification cannot pass muster even under the intermediate scrutiny standard of review that the majority purports to apply.
In reviewing any law that impinges on Second Amendment rights it must be borne in mind that Heller rejected a “judge-empowering ‘interest-balancing inquiry’ that ‘asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute’s salutary effects upon other important governmental interests.’ ” Heller, 554 U.S. at 634, 128 S.Ct. 2783 (quoting id. at 689-90, 128 S.Ct. 2783 (Breyer, J., dissenting)). Heller observed:
We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding “interest-balancing” approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges’ assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.
Id. at 634-35 (emphasis omitted). Heller therefore also makes clear that rational- *45 basis review “[canjnot be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.” Id. at 628, 128 S.Ct. 2788 n.27. “If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.” Id. But the majority here, while purporting to apply intermediate scrutiny, evaluates the challenged law in a manner that is not materially different from rational-basis review.
The justification relied on by the majority is ostensibly related to public safety concerns. There are two elements to the justification. Both are feeble. First, this reason is offered: “An armed attacker engaged in the commission of a crime, for example, might be more likely to target an open carrier than a concealed carrier for the simple reason that a visibly armed citizen poses a more obvious danger to the attacker than a citizen with a hidden firearm.” Majority op. at 39-40 (quoting State’s Answer Brief at 22). Second, it is suggested that the State is justified in displacing open carrying in favor of concealed carrying because “deranged persons and criminals would be less likely to gain control of firearms in public because concealed firearms—as opposed to openly carried firearms—could not be viewed by ordinary sight.” Id.
These reasons may not be totally irrational, but they do not provide any substantial justification for the ban on open carrying. Such “speculative claims of harm to public health and safety” are “not nearly enough to survive the heightened scrutiny that applies to burdens on Second Amendment rights.” Ezell v. City of Chicago, 846 F.3d 888, 890 (7th Cir. 2017). There is no substantial link between the ban and public safety, and the State’s speculation is no substitute for such a link.
The suggestion that someone committing a crime “might be more likely to target an open carrier than a concealed carrier,” majority op. at 39 (citation omitted), is subject to the rejoinder that a criminal confronted with the presence of an open carrier may be more likely to leave the scene rather than face the uncertain outcome of exchanging gunfire with an armed citizen. In hostile encounters between armed individuals, the outcome is seldom certain, and even criminals can understand that fact. Many—admittedly not all—armed criminals will give a wide berth to someone they know to be armed. Likewise, speculating about the disarming of individuals who are openly carrying firearms by “deranged persons and criminals,” id is a grasping-at-straws justification.
The reality is that it is highly unlikely that these feeble proffered justifications had anything to do with the adoption of the statute banning open carrying. As the history recounted by the majority indicates, the ban was adopted in the aftermath of the Legislature’s passage of the Jack Hagler Self-Defense Act, which broadly required the issuance of concealed-carry permits subject to narrow exclusions. See id. at 11-18. The ban on open carrying is best understood as the Legislature’s response to the public concerns swirling around adoption of the concealed-carry law. To properly understand this legislative response, two circumstances must be remembered. First, the Legislature acted long before Heller was decided and thus at a time when the individual right to keep and bear arms was a hotly contested issue of constitutional law. Second, then—as now—most individuals desiring to bear arms in public likely pre *46 ferred concealed carrying to open carrying.
The Legislature therefore acted to address the issue of public carrying, considered constituent preferences regarding concealed carrying, and weighed competing concerns in a context in which the contours of the Second Amendment right were wholly unsettled. Given this context, the Legislature opted for concealed carrying over open carrying. More to the point, the Legislature decided that the sacrifice of open carrying was a necessary and appropriate response to the public opposition generated by the passage of the concealed-carry law. But the legal landscape has now dramatically shifted. Heller has settled that the Second Amendment protects the right of individuals to keep and bear arms. And Heller’s historical analysis points strongly to the conclusion that the individual right includes the right to carry arms openly in public.
This truth should be acknowledged: opposition to open carrying stems not from concrete public safety concerns but from the fact that many people “are (sensibly or not) made uncomfortable by the visible presence of a deadly weapon.” Eugene Vo-lokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1523 (2009). Of course, many people are made uncomfortable by the fact that others are permitted to keep and bear arms at all. But contemporary sensibilities cannot be the test. Such sensibilities are no more a basis for defeating the historic right to open carrying than for defeating the understanding that the Second Amendment recognizes the right of individuals to keep and bear arms. “[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.” Heller, 554 U.S. at 636, 128 S.Ct. 2783. And “[constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.” Id. at 634-35, 128 S.Ct. 2783.
III.
Florida’s ban on the open carrying of firearms fails to satisfy the command of the Second Amendment, which is applicable to the States under the Fourteenth Amendment. The decision of the Fourth District therefore should be quashed.[20]
POLSTON, J., concurs.

. This does not mean that an ossified understanding of what constitutes "arms” should be adopted. The characteristics of particular firearms were not a focus of the tradition. Heller thus recognized that "the Second Amendment extends, prima facie, to all instruments that constitute hearable arms, even those that were not in existence at the time of the founding.” Heller, 554 U.S. at 582, 128 S.Ct. 2783; see also Caetano v. Massachusetts, — U.S. -, 136 S.Ct. 1027, 1027, 194 L.Ed.2d 99 (2016) (vacating decision that "upheld a Massachusetts law prohibiting the possession of stun guns”).

. Because the challenged statute is unconstitutional under the Federal Constitution, it is unnecessary to address the state constitutional claim.