Kreemaíj, J.,
delivered the opinion of the Court.
The questions presented for our decision in these cases, involve an adjudication of the constitutionality of *171 tbe act of the Legislature of Tennessee, passed June 11, . 1870, entitled “An act to preserve the peace and prevent homicide.”
The first section provides, “that it shall not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver. Any person guilty of a violation of this section shall be subject to presentment or indictment, and on conviction, shall pay a fine of not less than ten, nor more than fifty dollars, and be imprisoned at the discretion of the court, for a period of not less than thirty days, nor more than six months; and shall give bond in a sum not exceeding one thousand dollars, to keep the peace for the next six months after such conviction.”
The second section imposes upon all the peace officers of the State the duty of seeing this act enforced. The third section makes certain exceptions in favor of officers and policemen, while bona fide engaged in their official duties in execution of process, or while searching for, or engaged in arrest of criminals, and in favor of persons bona fide assisting officers of the law, and persons on a journey out of their county or State.
These are the leading provisions of this statute, and present the points of attack made upon it in argument' at the bar.
It is first insisted, that it is in violation of, and repugnant to the second article of the Amendments to the Constitution of the United States, which is, that “ a well regulated militia being necessary to the security of a free state, the right of the people to heep and bear arms shall not be infringed.
*172 On the other hand, it is maintained by the Attorney General, that these amendments have no application to the States, and spend their force by limiting the powers of the Federal Government; and are, in their nature, simple restraints imposed by the States upon the government created by them, and therefore we can not look to this article in order to test the validity of the acts in question. Upon the face of this article, it might have been plausibly insisted that it would have been operative upon, and control the action of the State, as well as of the Federal Government; and this position would apparently be strengthened by the other provision of the Constitution of the United-States, Art. 6, s. 2., that “this Constitution, and the laws of the United States which shall be made in pursuance thereof, shall be the supreme law of the land, and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding. It will be seen, however, that it is the “ Constitution, and laws made in pursuance thereof,” that are the supreme law of the land, so that we are to turn to that instrument, and ascertain what, by its fair construction and exposition, was intended to be allowed or prohibited, and to what powers its limitations and restrictions were applicable.
’With this view, we examine the question in reference to the proper application of the article of the amendment under consideration.
The case of Barron v. The Mayor and City Council of the City of Baltimore, 1 Pet., 465, Curtis’ ed., presented the question of the taking of private property, by the cor *173 poration of the city, as it was assumed for public use. It was insisted, in favor of the jurisdiction of the Supreme Court of the United States, to review the decision of the State court, that the case was within and arose under the provision of the Constitutional amendments, Art. 5, prohibiting the taking of private property for public use, without just compensation. That this amendment, being in favor of the liberty of the citizen, ought to be so construed as to restrain the legislative power of a State, as well as that of the United States. The question was discussed with his usual ability, by Chief Justice Marshall, and he lays down the proposition: “That the Constitution was ordained and established by the people of the United States, for themselves, for their own government, and not for the government of the individual States. Each State established a constitution for itself and, in that constitution, provided such limitations and restrictions on the powers of its particular government as its judgment dictated. The people- of the United States formed such a government for the United States as they supposed best adapted to their situation, and best calculated to promote their interests. The powers they conferred on this government were to be exercised by itself; and the limitations on power, if expressed in general terms, are naturally, and we think, necessarily applicable to the government created by the instrument. They are limitations of the power granted in the instrument itself; not of distinct governments, framed by different persons and for different purposes.” The learned Judge, after arguing the question at some length, says: “ If in every inhibition intended to act on State power, *174 in the original Constitution, words are employed to express that intent; some strong reason must be shown for departing from this safe and judicious course in framing the amendments, before that departure can be assumed.” He then goes on to demonstrate that no such reason existed. He says: “Had the people of the several States, or any of them, required changes in their constitutions; had they required additional safeguards from the apprehended encroachments of their particular governments, the remedy was in their own hands, and would have been applied by themselves. A convention would have been called by the discontented State, and the required improvements would have been made by itself. Had the framers of these amendments intended them to be limitations on the powers of the State governments, they would have imitated the framers of the original Constitution, and have expressed that intention.”
The Court, therefore, held that the provision of the 5th amendment, declaring that private property shall not be taken for public use without just compensation, was intended solely as a limitation on the power of the Government of the United States, and was not applicable to legislation of the States. See, also, 5 Wal., 479-80, and numerous other cases decided by the Supreme Court of the United States, cited in note to case of Barron v. City of Baltimore, Curtis’ ed., 468.
We need cite no authority to sustain the proposition that, upon a question involving the construction of the Constitution of the United States, or the just power of that government under said Constitution, the *175 decisions of the United States are binding on this Court, as well as all other courts of the States.
The State Legislature is not, then, limited in its powers on this subject by this article of the Constitution of the United States; it is a limitation, whatever be its construction and meaning, upon the powers of the other government, ordained and established by the people of the States themselves, or their Conventions or Legislatures.
We come now to the Constitution of the State of Tennessee, and endeavor to see what restrictions or limitations the sovereign people of Tennessee have chosen to place upon themselves, in reference to this subject, for the general good.
First, it may be assumed as almost an axiom in our law, with reference to the Legislatures, or law-making body of the States, that there is no limitation upon their powers, except such as are found either in the Constitution of the United States, or of the State itself. Plenary power in the Legislature, for all. purposes of civil government, is the rule. A prohibition to exercise a particular power, is an exception: Cooley, Const. Lim., 88, 89; People v. Draper, 15 N. Y., 543.
We do not, however, hold the power of the Legislature to be supreme for all purposes, when not in terms prohibited by one or the other of these Constitutions. We find limitations upon the powers of State Legislatures, as clearly defined by fair construction and implication, and as binding, as if expressed in so many words.
The division or separation of the powers of government in our States, between the three departments, *176 legislative, judicial and executive, involves restraint upon the action of the Legislature, that is imperative, and may be fairly arrived at with sufficient certainty by the application of the principle that it is the Legislature that is the law-making power. The well-settled common law definition of a law is, a rule of action prescribed by the law-making power. It must, then, of necessity, (subject to possible exceptions,) be an enactment operative in the future, in so far as it is to be a rule of action prescribed for the people of the State. No enactment of a Legislature can, in the nature of things, reach back, and control or give direction to an act already accomplished. It was complete from the moment of its birth, so to speak, and can not be influenced or affected by another act, subsequent in time.
This view, however, is only incidentally mentioned, as presenting a ground of limitation on the powers of State Legislatures.
The Constitution of Tennessee, of 1834, Art. 1, s. 24, of the Bill of Bights, is: “That the sure and certain defense of a free people is a well-regulated militia; and as standing armies in time of peace are dangerous to freedom, they ought to be avoided, as far as the circumstances and safety of the community will admit; and that, in all cases, the military shall be kept in strict subordination to the civil authority.” Section 25 exempts citizens, except such as are in the army of the United States, or militia in actual service, from punishment by martial law. Then follows section 26, which provides “that the free white men of this State have a right to keep and bear arms for their common defense.”
*177 Section 24, in the Constitution of 1870, is the same as in the Constitution of 1834.
Section 26 is: “That the citizens of this State have a right to keep and bear arms for their common defense. But the Legislature shall have power by law, to regulate the wearing of arms, with a view to prevent crime.”
What is the fair and legitimate meaning of this clause of the Constitution, and what limitations does it impose on the power of the Legislature to regulate this right? is the question for our consideration.
What rights are guaranteed by the first clause- of this Art. 26, “that the citizens have a right to keep and to bear arms for their common defense?” We may well look at any other clause of the same Constitution, or of the Constitution of the United States, that will serve to throw any light on the meaning of this clause. The first clause of section 24 says, “that the sure defense of a free people is a well-regulated militia.” We then turn to Art. 2, of amendments to the Constitution of the United States, where we find the same principle laid down in this language: “A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be abridged.” We find that, necessarily, the same rights, and for similar reasons, were being provided for and protected in both the Federal and State Constitutions; in the one, as we have shown, against infringement by the Federal Legislature, and in the other, by the Legislature of the State. What was the object held to be so desirable as to require that its attainment should be guaranteed by being inserted in the fundamental law of *178 the land? It was the efficiency of the people as soldiers, when called into actual service for the security of the State, as one end; and in order to this, they were to be allowed to keep arms. What, then, is involved in this right of keeping arms? It necessarily involves the right to purchase and use them in such a way as is usual, or to keep them for the ordinary purposes to which they are adapted; and as they are to be kept, evidently with a view that the citizens making up the yeomanry of the land, the body of the militia, shall become familiar with their use in times of peace, that they may the more efficiently use them in times of war; then the right to keep arms for this purpose involves the right to practice their use, in order to attain to this efficiency. The right and use are guaranteed to the citizen, to be exercised and enjoyed in time of peace, in subordination to the general ends of civil society; but, as a right, to be maintained in all its fullness.
The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. And clearly for this purpase, á man would have the right to carry them to and from his home, and no one could claim that the Legislature had the right to punish him for it, without violating this clause of the Constitution.
But farther than this, it must be held, that the right to keep arms, involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen m *179 times of peace; that in such use, he shall not use them for violation of the rights of others, or the paramount rights of the community of which he makes a part.
Again, in order to arrive at what is meant by this clause of the State Constitution, we must look at the nature of the thing itself, the right to keep which is guaranteed. It is “arms;” that is, such weapons as are properly designated as such, as the term is understood in the popular language of the country, and such as are adapted to the ends indicated above; that is, the efficiency of the citizen as a soldier, when called on to make good “the defence of a free people;” and these arms he may use as a citizen, in all the usual modes to which they are adapted, and common to the country.
What, then, is he protected in the right to keep and thus use? Not every thing that may be useful for offense or defense; but what may properly be included or understood under the title of arms, taken in connection with the fact that the citizen is to keep them, as a citizen. Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we would hold, that the rifle of all descriptions, the shot gun, the musket, and repeater, are such arms; and that under the Constitution the right to keep such arms, can not be infringed or forbidden by the Legislature. Their me, however, to be subordinated to such regulations and limitations as are or may be authorized by the law *180 of the land, passed to subserve the general good, so as not to infringe tbe right secured and the necessary incidents to - the exercise of such right.
What limitations, then, may the Legislature impose on the use of such arms, under the second clause of the 26th section, providing: “But the Legislature shall have power, by law, to regulate the wearing of arms, with a view to prevent crime?”
In the case of Aymette v. The State, 2 Hum., 159, Judge Greene said, that, “the convention, in securing the public political right in question, did not intend to take away from the Legislature all power of regulating the social relations of the citizen upon this subject. It is true, it is somewhat difficult to draw the precise line where legislation must cease, and where the political right begins, but it is not difficult to state a case where the right of the Legislature would exist.” . This was said in reference to the clause of the Constitution of 1834.
The Convention of 1870, knowing that there had been differences of opinion on this question, have conferred on the Legislature -in this added clause, the right to regulate the wearing of arms, with a view to prevent crime.
It is insisted by the Attorney General, as we understand his argument,[1] that this clause confers power on the Legislature to prohibit absolutely the wearing of all and every kind of arms, under all circumstances. *181 To this we can not give our assent. The power to regulate, does not fairly mean the power to prohibit; on the contrary, to regulate, necessarily involves the existence of the thing or act to be regulated. When applied to conduct or the doing of a thing, it must, of necessity, mean some check upon, or direction given to that conduct or course of action, implying the act being performed, but subject to certain limitations or restraints, either as to manner of doing it, or time, or circumstances under which it is or may be done. Adopt the view of the Attorney General, and the Legislature may, if it chooses, arbitrarily prohibit the carrying all manner of arms, and then, there would be no act of the citizen to regulate.
But the power is given to regulate, with a view to prevent crime. The enactment of the Legislature on this subject, must be guided by, and restrained to this end, and bear some well defined relation to the prevention of crime, or else it is unauthorized by this clause of the Constitution.
It is insisted, however, by the Attorney General, that, if we hold the Legislature has no power to prohibit the wearing of arms absolutely, and hold that the right secured by the Constitution is a private right, and not a public political one, then the citizen may carry them at all times and under all circumstances. This does not follow by any means, as we think.
While the private right to keep and use such weapons as we have indicated as arms, is given as a private right, its exercise is limited by the duties and proprieties of social life, and such arms are to be used in the *182 ordinary mode in. wbicli used in tbe country, and at tbe usual times and places. Sucli restrictions are implied upon their use as are thus indicated.
Therefore, a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them, nor necessary in order to his familiarity with them, and his training and efficiency in their use. As to arms worn, or which are earned about the person, not being such arms as we have indicated as arms that may be kept and used, the wearing of such arms may be prohibited if the Legislature deems proper, absolutely, at all times, and under all circumstances.
It is insisted by the Attorney General, that the right to keep and bear arms is a political, not a civil right. In this we think he fails to distinguish between the nature of the right to keep, and its necessary incidents, and the right to bear arms for the common defense. Bearing arms for tbe common defense may well be held to be a political right, or for protection and maintenance of such rights, intended to be guaranteed; but the right to keep them, with all that is implied fairly as an incident to this right, is a private individual right, guaranteed to the citizen, not the soldier.
It is said by the Attorney General, that the Legislature may prohibit the use of arms common in warfare, but not the use of them in warfare; but the idea of the Constitution is, the keeping and use of such arms as are useful either in warfare, or in preparing the citizen for their use in warfare, by training him as a citizen, to their use in times of peace. In reference to the sec *183 ond artiele of the Amendments to the Constitution of the United States, Mr. Story says, vol. 2, s. 1897: “The importance of this article will scarcely be doubted by any persons who have duly reflected upon the subject. The militia is the natural defense of a free country against sudden foreign invasion, domestic insurrection, and domestic usurpations of power by rulers. It is against sound policy for a free people to keep up a large military establishment and standing armies in times of peace, both from the enormous expense with which they are attended, and the facile means which they afford to ambitious rulers to subvert the government, or trample upon the rights of the people. The right of the citizen to keep and bear arms, has justly been considered as the palladium of the liberties of the republic, since it offers a strong moral check against usurpation and arbitrary power of rulers; and will in general, even if these are successful in the first instance, enable the people to resist and triumph over them.”
"We cite this passage as throwing light upon what was intended to be guaranteed to the people of the States, against the power of the Federal Legislature, and at the same time, as showing clearly what is the meaning of our own Constitution on this subject, as it is evident the State Constitution was intended to guard the same right, and with the same ends in view. So that, the meaning of the one, will give us an understanding of the purpose of the other.
The passage from Story, shows clearly that this right was intended, as we have maintained in this opinion, and was guaranteed to, and to be exercised and enjoyed *184 by the citizen as such, and not by him as a soldier, or in defense solely of his political rights.
Mr. Story adds, in this section: “Yet though this truth would seem to be so clear, (the importance of a militia,) it can not be disguised that among the American people, there is a growing indifference to any system of militia discipline, and a strong disposition, from a sense of its burdens, to be rid of all regulations. How is it practicable,” he asks, “to keep the people duly armed without some organization, it is difficult to see. There is certainly no small danger that indifference may lead to disgust, and disgust to contempt, and thus gradually undermine all the protection intended by this clause of our national bill of rights.”
We may for a moment, pause to reflect on the fact, that what was once deemed a stable and essential bulwark of freedom, “a well regulated militia,” though the clause still remains in our Constitutions, both State and Federal, has, as an organization, passed away in almost every State of the Union, and only remains to us as a memory of the past, probably never to be revived.
As wo understand the able opinion of Judge Green, in the case of Aymette v. State, 2 Hum., 158, he holds the same general views on this question, which are to be found in this opinion. He says: “As the object for which the right to keep and bear arms is secured is of a general nature, to be exercised by the people in a body for their common defense, so the arms — the right to keep which is secured- — -are such as are usually employed in civilized warfare, and constitute the ordinary military equipment. If the citizens have these arms *185 in their hands, they are prepared in the best possible manner, to repel any encroachments upon their rights by those in authority.”
He says, on p. 159: “The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which a,re not usual in civilized warfare, or would not contribute to the common defense.” And we add, that this right to keep arms,' though one secured by the Constitution, with such incidents as we have indicated in this opinion, yet it is no more above regulation for the general good than any other right. The right to hold property is secured by the Constitution, and no man can be deprived of his property “but by the judgment of his peers, or the law of the land.” If the citizen is possessed of a horse, under the Constitution it is protected and his right guaranteed, but he could not, by virtue of this guaranteed title, claim that he had the right to take his horse into a church to the disturbance of - the people; nor into a public assemblage in the streets of a town or city, if the Legislature chose to prohibit the latter and make it a high misdemeanor.
The principle on which all right to regulate the use in public of these articles of property, is, that no man can so use his own as to violate the rights of others, or of the community of which he is a member.
So we may say, with reference to such arms, as we have held, he may keep and use in the ordinary mode known to the country, no law can punish *186 him for so doing, while he uses sucb arms at home or on his own premises; he may do with his own as he will, while doing no wrong to others. Yet, when he carries his property abroad, goes among the people in public assemblages where others are to be affected by his conduct, then he brings himself within the pale of public regulation, and must submit to such restrictions on the mode of using or carrying his property as the people through their Legislature, shall see fit to impose for the general good.
We may here refer to the cases of Bliss v. Commonwealth., 2 Littell, Ky., R., 90; State v. Reid, Alabama R., 612, and case of Nunn v. State of Georgia, 1 Kelly Rep., 243, as containing much of interesting and able discussion of these questions; in the two last of which the general line of ai’gument found in this opinion is maintained. The Kentucky opinion takes a different view, with which we can not agree. We have not folio w'ed precisely either of these cases, but have laid down our own views on the questions presented, aided, however, greatly by the reasoning of these enlightened courts.
We hold, then, that the Act of the Legislature in question, so far as it prohibits the citizen “either publicly or privately to carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol,” is constitutional. As to the pistol designated as a revolver, we hold this may or may not be such a weapon as is adapted to the usual equipment of the soldier, or the use of which may render him more efficient as such, and therefore hold this to be a matter to be settled by evidence as to what character of weapon *187 is included in the designation “revolver.” Ve know there is a pistol of that name which is not adapted to the equipment of the soldier, yet we also know that the pistol known as the repeater is a soldier’s weapon— skill in the use of which will add to the efficiency of the soldier. If such is the character of the weapon here designated, then the prohibition of the statute is too broad to be allowed to stand, consistently with the views herein expressed. It will be seen the statute forbids by its terms, the carrying of the weapon publicly or privately, without regard to time or place, or circumstances, and in effect is an absolute prohibition against keeping such a weapon, and not a regulation of the use of it. Under this statute, if a man should carry such a weapon about his own home, or on his own premises, or should take it from his home to a gunsmith to be repaired, or return with it, should take it from his room into the street to shoot a rabid dog that threatened his child, he would be subjected to the severe penalties of fine and imprisonment prescribed in the statute.[1]
In a word, as we have said, the statute amounts to a prohibition to keep and use such weapon for any and all purposes. It therefore, in this respect, violates the constitutional right to keep arms, and the incidental right to use them in the ordinary mode of using such arms and is inoperative.
If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or *188 abroad, in sucb a manner as may be deemed most con-cive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to sustained.[1]
The question as to whether a man can defend himself against an indictment for carrying arms forbidden to be carried by law, by showing that he carried them in self-defense, or in anticipation of an attack of a dangerous character upon his person, is one of some little difficulty. The real question in such case, however, is not the right of self-defense, as seems to be supposed, (for that is conceded by our law to its fullest extent,) but the right to use weapons, or select weapons for such defense, which the law forbids him to keep or carry about his person. If this plea could be allowed as to weapons thus forbidden, it would amount to a denial of the right of the Legislature to prohibit the keeping of such weapons; for, if he may lawfully use them in self-defense, he may certainly provide them, and keep them, for such purpose; and thus the pica of right of self-defense will draw with it, necessarily, the right to keep and use everything for such purpose, however pernicious to the general interest or peace or quiet of the community. Admitting the right of seif-defense in its broadest sense, still on sound principle every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good; and where certain weapons are forbidden to be kept or used by the law of the land, in order to the pre *189 vention of crime — a great public end — no man can be permitted to disregard this general end, and demand of the community the right, in order to gratify his whim or willful desire to use a particular weapon in his particular self-defense. • The law allows ample means of self-defense, without the use of the weapons which we have held may be rightfully proscribed by this statute. The object being to banish these weapons from the community by an absolute prohibition for the prevention of crime, no man’s particular safety, if such case could exist, ought to be allowed to defeat this end. Mutual sacrifice of individual rights is the bond of all social organizations, and prompt and willing obedience to all laws passed for the general good, is not only the duty, but the highest interest of every man in the land.
The principle we have laid down is sustained by a well established rule of the law of nations in the conduct of war. "While the general rule is, that one belligerent may do his enemy all the injury he can, and for such purpose may lawfully kill him, yet the use of poisoned weapons is forbidden by the law of nations, on the ground that higher ends are thereby subserved, and the rights of sovereign belligerent nations even should be made subordinate to these ends: Mattel Law of Nations, top p. 361. So while the right of self-defense is one at all times to be maintained, yet as to the means used to attain this end, they 'must be subordinated to the higher claims of the general good of the community.
We admit extreme cases may be put, where the rule may work harshly, but this is the result of all general rules; that they may work harshly sometimes in individ *190 ual cases. By our system, however, allowing the Attorney General to enter nolle prosequi, with the assent of the Court, there is but little danger of the law being enforced in any such cases to the detriment of any one; and if such case should occur, an application to Executive clemency may fairly be assumed as the remedy provided by the Constitution to meet all such exigencies.
In the case of The State v. Andrews, one of the cases now under investigation, it is stated in bill of exceptions, that a “plea of self-defense” was hied, demurred to, and demurrer overruled. We can not notice the action of the court on this question, as the plea is not set out so that we can see its allegations and judge of their merits
It was proposed, however, to prove, “that there was a set of men in the neighborhood of defendant during the time he had carried his pistol, and before, seeking the life of defendant.” This testimony was objected to, and objection sustained by the court. We can not see from this statement that the court erred, as the character of the weapon is nowhere shown; and it may have been such a weapon, as we have held above, to have been properly forbidden to be carried at all. If so, then it was no defense to the indictment.
The proof, however, showed that he had been in the habit of carrying a pistol since the war. In such a case, he could not claim that he was really in peril of life or limb or great bodily harm, so imminent as to present any element of self-defense in justification of his carrying his pistol.
The law of the land gave him ample protection, if'he had chosen to seek its aid by authorizing, on proper ap *191 plication,, the arrest of tbe parties, and sureties to keep tbe peace, or confinement in prison, to prevent the threatened injury. No court can assume that tbe law, in such case, would be powerless to give the needed protection. And we bold, that it is not only tbe highest duty of all, to submit to the law, and seek its protection, thus doing reverence to its mandates, but that this involves no humiliation, nor element of cowardice. On the contrary, it marks the highest moral courage to do right, notwithstanding passion and pride may urge us to the contrary course. He who subordinates his pride and his passions to the high behests of social duty, has shown himself as possessing the highest attribute of a noble manhood, sacrifice of self and pride, for the public good, in obedience to law.
In this view of the case, the question of what circumstances will justify a party in carrying arms, such as the Constitution permits him to keep, in legitimate self-defense, is hardly fairly before us. We may say, that the clause of the Constitution authorizing the Legislature to regulate the wearing of arms with a view to prevent crime, could scarcely be construed to authorize the Legislature to prohibit such wearing, where it was clearly shown they were worn Iona fide to ward off or meet imminent and threatened danger to life or limb, or great bodily harm, circumstances essential to make out a case of self-defense. It might well be maintained they were not worn under such circumstances in order to crime, or that such purpose existed, or that the wearing under the circumstances indicated, of a weapon that might lawfully be kept, had any direct tendency to pro *192 duce crime. On the contrary, the purpose would be to prevent the commission of crime on the part of another.
If the party is protected in the keeping and use of such arms as we have indicated, only to be restrained by such regulations as may be enacted by the Legislature, with a view to prevent crime, it would seem that the use of such a weapon for defense of the person when in actual peril, the end being a lawful one, ought not, upon any sound principle, to subject a party to punishment. However, when the Legislature shall enact a law regulating the wearing of -weapons constitutionally allowed to be kept and used, as held in this opinion, the question may be presented fairly, and can be decided.
There was a motion to quash the indictment in each one of these cases, which -was overruled. The indictment in each case only charges that the parties carried a pistol, without specifying the character of the weapon, whether belt or pocket pistol, or revolver. This was too indefinite a charge on such a statute, however literally it might be construed. There should be such specifications in the indictment as will enable the court to see that the weapon forbidden by the statute has been worn, and to inform the defendant of the character of weapon for the carrying of which he is to be held to answer’.
For this error the cases will be reversed; the indictments quashed, and remanded to the Circuit Courts to be further proceeded in.
NicholsoN, C. J., and Deadeuick, J., concurred in *193 the general views of the opinion. Sneed, J., dissented from so muclr of the opinion as questioned the right of the Legislature to prohibit the wearing of arms of airy description, or sought to limit the operation of the act of 1870.

 It will be seen, by reference to the argument, that the judge has not in this and the following paragraphs, caught its spirit with his wonted accuracy. And see p. 199 in note.

 See Page v. State. Post 198, in note.

 See Act of 1871, c. 90.