# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :          APPEAL No.    C-240317
                                                   TRIAL No.     B-2303830
      Plaintiff-Appellee,          :

  vs.                                   :

                            JUDGMENT ENTRY

DESMOND HALL,                           :

      Defendant-Appellant.         :


This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 5/8/2025 per order of the court.**


**By:**_____

       **Administrative Judge**

[Cite as *State v. Hall*, 2025-Ohio-1644.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                    :         APPEAL NO.   C-240317
                                            TRIAL NO.    B-2303830
    Plaintiff-Appellee,       :

  vs.                             :

DESMOND HALL,                     :             *O P I N I O N*

    Defendant-Appellant.      :



Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 8, 2025



*Connie Pillich*, Hamilton County Prosecuting Attorney, *Norbert Wessels* and *Jon Vogt*, Assistant Prosecuting Attorneys, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah Nelson*, Assistant Public Defender, for Defendant-Appellant.

**CROUSE, Presiding Judge.**

{¶1} Desmond Hall appeals his conviction, after a no-contest plea, for carrying a concealed weapon in violation of R.C. 2923.12(A)(2). He argues that the seizure and search of his person were unreasonable under the Fourth Amendment and that the charges against him infringed upon his right to bear arms under the Second Amendment.

{¶2} Upon comparing the totality of the circumstances surrounding Hall's seizure with those underlying the Ohio Supreme Court's decision in *State v. Hairston*, 2019-Ohio-1622, we conclude that the officer had reasonable suspicion to perform a limited seizure and attendant search of Hall's person. And upon reviewing evidence concerning our nation's history and tradition of concealed-carry regulations, we conclude that the Second Amendment generally permits the states to enforce laws that prohibit the carrying of concealed weapons by some or all of their citizens—so long as they remain able to carry arms openly, in a manner that leaves the weapons practicably usable for legitimate self-defense. As we explain in greater detail below, we reject both of Hall's contentions and affirm the judgment of the trial court.

## I. BACKGROUND

{¶3} Cincinnati Police Officer Christopher Delraso was patrolling along West Martin Luther King Drive when, shortly before 11:00 p.m., he heard gunshots coming from the direction of the nearby Clifton Colony Apartments. Delraso was familiar with Clifton Colony. The apartment complex was along his regular patrol route, and he had stopped there on numerous occasions, often in response to reports of shots fired, during his six years working at District 5.

{¶4} Roughly two minutes after hearing the shots, Delraso pulled into the Clifton Colony parking lot. He headed toward the portion of the lot closest to Martin

Luther King Drive, where he thought he'd heard the shots originate. As he pulled into the lot, Delraso encountered an individual who pointed in the direction the officer was already heading. As Delraso continued, he spied two men standing at the corner of an apartment building near the shots' putative point of origin: Hall and another individual, whom Delraso believed to be Hall's "friend or a relative of." The only other people in the lot were, according to Delraso, "two females walking from the other side like up the parking lot."

{¶5} Delraso parked his cruiser, approached Hall and his companion on foot, and asked the two men if they had heard gunshots. They said they had. One or both of the men indicated that the shots had come from the other side of the lot and that they had seen the shooter run into an apartment building in the same area.

{¶6} According to Delraso's testimony, it was at this point that he noticed "a bulge in [the] left front pocket" of Hall's companion, which the officer suspected "could be a firearm." Delraso asked both men if they had a firearm, to which Hall responded that he owned a firearm, but that it was inside his apartment. Delraso, unconvinced and unwilling to turn his back to the young men, informed Hall and his companion that he intended to pat them down. As Delraso went to touch Hall's right side, Hall pulled away from Delraso and threw up his arm. Delraso responded by grabbing Hall's right arm. At this point, Hall told the other man to "run inside and get his girl." The man ran into the apartment building, leaving Hall alone with Officer Delraso.

{¶7} Delraso asked Hall, "[I]f you don't have a firearm, what's the problem?" Hall acquiesced and admitted that he had a gun in his pocket, at which point Delraso placed him in handcuffs. Delraso's subsequent pat down of Hall's person uncovered a handgun.

{¶8} Hall was indicted for carrying a concealed weapon without being a

"qualifying individual," in violation of R.C. 2923.12(A)(2), a fourth-degree felony. The basis for Hall's disqualification, according to the State's bill of particulars, was a pending charge against Hall for negligent assault.

{¶9} In his motion to suppress the evidence obtained from Delraso's seizure and subsequent search of Hall's person, Hall argued that his Fourth Amendment rights had been violated. The trial court denied this motion. Hall then moved to dismiss the indictment, arguing that the concealed-carry statute as applied to him violated his right "to keep and bear Arms" under the Second Amendment to the United States Constitution and its analogue in the Ohio Constitution. The trial court denied this motion as well. With both his motions denied, Hall entered a plea of "no contest" and was sentenced to community control. This appeal timely followed.

## II. FIRST ASSIGNMENT OF ERROR: *TERRY* STOP & FRISK

{¶10} In his first assignment of error, Hall contends that the trial court erred in denying his motion to suppress, because Officer Delraso had violated the Fourth Amendment by seizing Hall without reasonable articulable suspicion.

{¶11} While Hall pled "no contest" to the facts alleged in the indictment, Crim.R. 12(I) provides that a "plea of no contest does not preclude a defendant from asserting upon appeal that the trial court prejudicially erred in ruling on a pretrial motion, including a pretrial motion to suppress evidence."

{¶12} Appellate review of a motion to suppress "presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. We must therefore accept the trial court's findings of fact as true if they are supported by competent and credible evidence. *State v. Rogers*, 2022-Ohio-4535, ¶ 26 (1st Dist.). We then independently determine, without deferring to the trial court's conclusions, whether the facts satisfy the applicable legal standard. *Id.*

5

**{¶13}** The Fourth Amendment prohibits "unreasonable searches and seizures" of persons and property, and any evidence derived from an unconstitutional search or seizure may be subject to exclusion at trial. *Id.* at ¶ 25. The justification needed to render an officer's seizure of a person "[]reasonable" under the Fourth Amendment varies with the character of the seizure. On one hand, a consensual encounter between officer and civilian is not considered a "seizure" at all and therefore requires no Fourth Amendment justification. On the other, an arrest—the most invasive sort of seizure—will only be "reasonable" if the officer has "probable cause" to believe the arrestee has committed a crime. *See State v. Jordan*, 2021-Ohio-3922, ¶ 19. "[B]rief investigative stops that fall of short of traditional arrests"—often called "*Terry* stops" after *Terry v. Ohio*, 392 U.S. 1 (1968)—fall somewhere in the middle. *See State v. Hairston*, 2019-Ohio-1622, ¶ 9. *Terry* stops *are* seizures, and therefore subject to Fourth Amendment scrutiny, but can be effected upon "reasonable suspicion," a standard that "is less demanding than the probable-cause standard." *Id.* at ¶ 9, 10.

**{¶14}** In this case, the parties acknowledge that Delraso's initial attempt to grab Hall constituted a "seizure" for Fourth Amendment purposes. They also appear to agree that the seizure at issue was part of a "[b]rief investigative stop[]" rather than an arrest, and that it should therefore be governed by *Terry*'s reasonable-suspicion standard. Because the search of Hall's person and the evidence Hall sought to suppress below were downstream of this seizure, we begin by considering whether Delraso had reasonable suspicion to seize Hall at the moment he grabbed for him.

**{¶15}** A *Terry* stop is reasonable "when the officer has a reasonable suspicion based on specific and articulable facts," taken together with any rational inferences from those facts, "that criminal behavior has occurred or is imminent." *Hairston* at ¶ 9, citing *Terry* at 30; *accord State v. Wright*, 2022-Ohio-2161, ¶ 14 (1st Dist.). We

6

judge reasonable suspicion "based on the totality of circumstances 'viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.'" *Hairston* at ¶ 10, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991).

{¶16}  Under the totality of the circumstances in this case, and especially in light of the Ohio Supreme Court's decision in *Hairston*, we conclude that Delraso had reasonable suspicion to effect a limited, investigative seizure of Hall's person under *Terry*.

{¶17}  The facts of *Hairston* closely resemble the present case in several salient respects. There, as here, the officer testified that he had "personally heard the sound of gunshots" coming from "close-by." *Hairston*, 2019-Ohio-1622, at ¶ 11. There, as here, the incident occurred "after dark" at a location where the officer regularly encountered similarly concerning criminal activity. *Id.* at ¶ 12. There, as here, the stop "occurred very close in time to the gunshots." *Id.* at ¶ 13. And there, as here, the defendant was among the only apparent suspects. *Id.*

{¶18}  Several differences separate this case from *Hairston*, however.

{¶19}  *First*, and most importantly, Hairston was alone, while Hall was not. The *Hairston* court placed a heavy emphasis on the fact that "[w]hen [the officers] arrived, Hairston—and no one else—was there." *Id.* Hall contends that this fundamentally separates his case from *Hairston*—after all, the officer saw four other people that night at Clifton Colony. But three of those people were not near where Delraso had heard the gunfire, they were on the other end of the lot. That left Hall and his compatriot as the only individuals near the spot from which the shots had allegedly been fired just two minutes earlier. Hall contends that, because there were two people standing in that location, the officer had no *individualized* reasonable suspicion to

think Hall had fired the weapon. But Delraso's testimony suggested a clear familiarity between the two men—they had the appearance of "relative[s] or friend[s]." And it was not unreasonable for Delraso to suspect that more than one person might have been involved in the shooting. The presence of Hall's companion does not meaningfully distinguish this case from *Hairston*. *See, e.g., In re A.M.J.*, 2024-Ohio-5889, ¶ 4-5, 14 (10th Dist.) (upholding seizure under *Hairston* of two individuals on bicycles near the area origin-point of gunfire).

{¶20} *Second*, the officer in this case arrived on the scene about two minutes after the shots—a slightly longer time period than the 30 to 60 seconds in *Hairston*. *See Hairston*, 2019-Ohio-1622. at ¶ 13; *see also A.M.J.* at ¶ 18. While this difference is slight, it is not negligible. A lot can happen in one minute, including a perpetrator's flight from the scene of the crime. Nevertheless, the added minute is unlikely, on its own, to render Delraso's suspicion unreasonable.

{¶21} *Third*, in this case, Delraso's belief that the gunshots originated from a specific location in the parking lot was corroborated by an individual who directed him toward Hall and his companion. This gave Delraso's suspicion an added degree of particularity beyond the officer in *Hairston*. This independent confirmation not only reinforced Officer Delraso's initial suspicion but also provided an objective basis for his investigation of the area, rendering his seizure of the suspects he found there more reasonable.

{¶22} *Fourth*, in addition to all of the above, Delraso also noticed a bulge in the pocket of Hall's associate. This strengthened his suspicion that this pair may have played some part in the gunshots fired two minutes prior.

{¶23} Whatever the salience of any of these factors standing alone might be, taken in their "totality," they amount to reasonable suspicion. *See Hairston*,

8

2019-Ohio-1622, at ¶ 15 ("The court of appeals went astray by focusing on individual factors in isolation rather than on the totality of the circumstances."). On the record before us, Delraso (1) heard gunshots coming from the direction of Clifton Colony, (2) regularly handled calls for shots fired at Clifton Colony, (3) received corroboration from a passerby as to the part of the property from which the shots were fired, (4) arrived at the suspected location of the gunfire two minutes later, (5) found two men who seemed to him like "relative[s] or friend[s]"—and no one else—standing together by the gunshots' origin point, and (6) noticed that one of the men had a bulge consistent with a gun in his front pocket. Under all these circumstances, Delraso could reasonably have suspected that these two men were involved in the gunshots that had brought him to Clifton Colony. And because Delraso could reasonably suspect that either of them were involved in criminal activity, he could reasonably perform a limited seizure of their persons to effectuate a brief, investigative detention.

{¶24} Given the relevant factual similarities, we conclude that *Hairston* controls our analysis of the reasonableness of this stop. On these facts, Delraso could reasonably stop Hall and his companion "to see if [they were] the source of or had information about the gunshots." *Id.* at ¶ 18.

{¶25} But reasonable suspicion to stop a suspect is not *necessarily* reasonable suspicion to search them. *Terry* permits an officer to perform a "limited protective search" of an individual they have lawfully seized if they have reasonable suspicion that the "individual may be armed and presently dangerous." *State v. Henson*, 2022-Ohio-1571, ¶ 15 (1st Dist.), citing *Hairston* at ¶ 9. In other words, a *Terry* frisk is lawful if (1) the officer has reasonably seized the individual to be frisked (even if that seizure occurs at the instant the pat-down begins), (2) the officer reasonably suspects that the individual is armed and presently dangerous, and (3) the search is limited to

the outer clothing and intended only to check for weapons. *See id.*

{¶26} Here, as we have already discussed, Delraso had reasonable suspicion to seize Hall. Specifically, Delraso reasonably suspected that Hall and his comrade had been involved in the discharge of a firearm two minutes prior. Where an officer has sufficient reason to suspect an individual was recently involved in a shooting, that officer will generally have reason to suspect that individual is armed and dangerous. *See Hairston*, 2019-Ohio-1622, at ¶ 18 ("[B]ecause the gunshots gave the officers reason to suspect that *Hairston* was armed, they were justified in patting him down for their safety."). Thus, given the nature of the suspected criminal conduct (discharging a firearm) and the brief lapse in time (two minutes) in this case, the same reasonable suspicion that justified Delraso's seizure of Hall's person also justified his frisking Hall for weapons.

{¶27} Under the totality of the circumstances, Delraso had reasonable suspicion that Hall had been involved in the gunshots. Delraso's investigative seizure of Hall's person and subsequent weapons frisk were therefore reasonable under the Fourth Amendment. We hold that the trial court properly denied Hall's motion to suppress. Hall's first assignment of error is overruled.

### III. SECOND ASSIGNMENT OF ERROR: *BRUEN* CHALLENGE

{¶28} In his second assignment of error, Hall challenges the trial court's denial of his motion to dismiss the indictment on constitutional grounds. Specifically, Hall argues that the constellation of Ohio statutes that prohibited him from carrying a concealed handgun infringed upon his right to bear arms, protected by the Second Amendment to the United States Constitution and Article 1, Section 4, of the Ohio Constitution.

{¶29} Whether charges in an indictment should be dismissed on

constitutional grounds is a question of law, which this court reviews de novo. *See State v. Thacker*, 2024-Ohio-5835, ¶ 7 (1st Dist.); *State v. Brown*, 2025-Ohio-8, ¶ 5 (1st Dist.); *see also State v. Troisi*, 2022-Ohio-3582, ¶ 17.

**{¶30}** Hall was charged with carrying a concealed weapon ("CCW") under R.C. 2923.12(A)(2), which makes it a crime for any person to "knowingly carry or have, concealed on the person's person or concealed ready at hand, . . . [a] handgun other than a dangerous ordnance." That statute, however, exempts licensed handgun holders. R.C. 2923.12(C)(2). And the General Assembly has elsewhere provided that, for purposes of several Code sections including R.C. 2923.12, any "person who is a qualifying adult . . . shall be deemed to have been issued a valid concealed handgun license." R.C. 2923.111(C)(1)(a); *see also State v. Storms*, 2024-Ohio-1954, ¶ 21 (1st Dist.).

**{¶31}** Thus, Hall's conduct (carrying his weapon concealed) was only unlawful if he was not a "qualifying adult" on the date listed in the indictment. An individual is defined as a "qualifying adult" if, pursuant to R.C. 2923.111(A)(2), they (a) are at least 21 years of age, (b) are not otherwise prohibited from possessing or receiving a firearm under 18 U.S.C. 922(g)(1)-(9) or R.C. 2923.13 (i.e., Ohio's weapons-under-disability statute), and (c) satisfy certain of the criteria set forth in R.C. 2923.125(D)(1). As relevant here, an individual cannot be a "qualifying adult" if, at the time of the arrest, they were "under indictment for or otherwise charged with . . . a violation of section 2903.14 or 2923.1211 of the Revised Code." R.C. 2923.125(D)(1)(d).

**{¶32}** Hall does not contest that, at the time of his arrest, he had been charged with misdemeanor negligent assault pursuant to R.C. 2903.14 and was therefore disqualified from carrying a concealed firearm under R.C. 2923.125(D)(1)(d). The State, in turn, has not argued or alleged that it had any other basis for deeming Hall

not to be a "qualifying individual" under R.C. 2923.111(A)(2).

{¶33} The legal question before us, then, is whether the Second Amendment or the Ohio Constitution prohibited the State from prosecuting Hall for carrying a concealed handgun because he had a pending negligent-assault charge. We turn first to the Second Amendment.

### A. *The Second Amendment Inquiry under* Bruen

{¶34} In 2008, the United States Supreme Court held that the Second Amendment protected an individual's right to bear arms for personal defense. *Dist. of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Two years later, the Court held that the right was incorporated against the states by the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). And then, in 2022, the Court held that the constitutional right to bear arms included a right to carry those arms in public for personal defense. *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 70 (2022).

{¶35} *Bruen* reached this conclusion by applying what some have called the "text, history, and tradition" test, which the Court announced as the exclusive test for determining a law's constitutionality under the Second Amendment. *Id.* at 17, 24. This test has two steps: (1) We ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. (2) If so, then "the Constitution presumptively protects that conduct," and the burden shifts to the State to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

### B. Bruen *Step 1: Plain Text*

{¶36} We therefore begin our inquiry by asking whether the Second Amendment's plain text covers Hall's allegedly protected conduct—i.e., carrying a

concealed firearm. The State concedes that it does, and our precedent agrees. In *Storms*, 2024-Ohio-1954, at ¶ 24 (1st Dist.), this court held that the carrying of a concealed weapon fell "under the plain text of the Second Amendment" and thus satisfied step one of *Bruen*. We therefore proceed to step two.

### C. Bruen *Step 2: History, Tradition & Relevant Analogues*

#### 1. *Framing the Inquiry*

**{¶37}** We next ask whether our nation's history and tradition supported the State's effort to criminalize Hall's carrying of a concealed firearm. This second step is meant to assist courts in discovering the "public understanding of the Second Amendment" at the time of ratification. (Cleaned up.) *Bruen*, 597 U.S. at 35, quoting *Heller*, 554 U.S. at 605. The State bears the burden of proving that a law regulating conduct within the Amendment's plain text is constitutional, and so it must adduce evidence that the challenged law does not trample upon rights the ratifying public believed itself to be protecting.[1] To discharge this burden, the State must show that its "new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" (Bracketed text in original.) *United States v. Rahimi*, 602 U.S. 680, 692 (2024), quoting *Bruen* at 29 and fn. 7.

**{¶38}** Courts begin this analogic inquiry by considering "[w]hy and how" a modern regulation "burdens the right" protected by the Amendment. *Id.* at 692. They then look to proposed historical analogues to determine whether the challenged

---

[1] The State's brief expressly "incorporate[d], by reference, the historical citations contained within its original memorandum" to the trial court. Further, the State relied on discussions of historical laws and tradition from *Bruen*. As such, we have canvassed the relevant laws cited expressly by the State in its brief and trial-court memorandum, as well as the laws and judicial opinions pertaining to public and concealed carry of firearms cited by the United States Supreme Court in *Bruen*. Further, we have considered the authorities cited and discussed in those antebellum judicial opinions, as we would do when considering any cited judicial opinion.

statutes comport with the "principles that underpin our regulatory tradition," which mark the metes and bounds of the Second Amendment's historical protections. *Id.* "[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* However, even if a modern statute's purpose or objective aligns with the goals of founding-era regulations (i.e., a similar "why"), the modern law should not burden the right significantly "beyond what was done at the founding" (i.e., a similar "how"). *Id.*

{¶39} The State asserts that, unlike several of our prior Second Amendment opinions, the statutes at issue here regulate "only the manner in which Hall can carry a firearm," and leave unscathed "Hall's right to publically [sic] carry a firearm" more generally. The State is right to draw such a distinction between concealed-carry restrictions and wholesale bans on possession or public-carry. Under *Heller*, *McDonald*, and *Bruen*, a law that prohibits all persons from owning or carrying all firearms would be clearly unconstitutional. Thus, when a State law disarms a particular class of persons (what we have called a "categorical ban"), we have required the State to show that its law falls within some tradition of disarming an analogous group. *See Thacker*, 2024-Ohio-5835, at ¶ 17, 54-55 (1st Dist.); *Brown*, 2025-Ohio-8, at ¶ 8-11 (1st Dist.). Only if the State can identify some tradition of disarming people relevantly similar to those disarmed by the State's modern law will it survive Second Amendment scrutiny. Thus, in *Thacker*, we held the State's application of its weapons-under-disability law unconstitutional because the State had failed to identify a "relevantly similar tradition of imposing presumptively permanent disarmament upon persons who have been found to have engaged in unlawful, nonviolent conduct but who are presumed to have reformed." *Thacker* at ¶ 108. And in *Brown*, we held a

14

related provision unconstitutional as applied to disarm an individual under indictment because "the State ha[d] offered no example of a founding-era law . . . categorically disarming every individual indicted for certain offenses." *Brown* at ¶ 55.

**{¶40}** But this case concerns a restriction on the manner in which Hall could carry his weapon, not a law disarming him entirely or forbidding him to carry his gun in public. While the United States Supreme Court has held that a state may not disarm its public at large, it has *not* said the same about the imposition of universal CCW restrictions. Indeed, *Heller* and *Bruen* implied that a state *could* enact such a general concealed-carry ban.

**{¶41}** *Heller* noted that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626. But this statement was among *Heller*'s dicta regarding "presumptively lawful regulatory measures," *id.* at 626-627 and fn. 26, some of which have struggled to survive *Bruen* scrutiny. *See Thacker* at ¶ 50; *Range v. Atty. Gen. of the United States*, 124 F.4th 218, 228-230 (3d Cir. 2024) (en banc) (holding application of felon-in-possession ban unconstitutional despite *Heller*'s dicta).

**{¶42}** In this case, however, *Bruen*'s own analysis endorsed *Heller*'s CCW dictum. *Bruen* examined numerous 19th-century statutes and judicial decisions restricting individuals' ability to carry in public, many of which specifically addressed the carrying of *concealed* weapons. *See Bruen*, 597 U.S. at 52-55. Upon completion of that survey, the Court concluded that the antebellum courts had upheld "concealed-carry prohibitions . . . only if they did not similarly prohibit *open* carry," thus "reveal[ing] a consensus that States could *not* ban public carry altogether." (Emphasis sic.) *Id.* at 53; *accord id.* at 55 ("All told, these antebellum state-court decisions evince

a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues.").

**{¶43}** Because *Bruen* did not specifically address a concealed-carry regulation, it does not control the outcome in this case. Even so, *Bruen*'s framing of the historical scope of the right provides initial support for the State's distinction between concealed-carry bans and total disarmament. And *Bruen*'s reliance on antebellum concealed-carry statutes provides a useful guidepost in sifting the historical sources in search of "relevantly similar" laws from the relevant historical period.

### 2. *Surveying the Historical Materials*

#### a. Selecting the Sources

**{¶44}** *Bruen*'s reliance on 19th-century sources raises a methodological problem, however: if *Bruen*'s history-and-tradition test is meant to capture the original public understanding of the Second Amendment, *Bruen* at 35, what use are 19th-century decisions rendered decades after that amendment was passed? How we answer this question will differ depending on *which* ratification we're concerned about. When looking for the original public meaning of the right to keep and bear arms, we must first determine whether the scope of that right is "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," or whether the doctrine of incorporation demands that we "primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868." *See Bruen* at 37. *Bruen*, *Rahimi*, *Thacker*, and *Brown* elected not to resolve this issue. *See id.* at 37-38 (declining to address this "ongoing scholarly debate"); *Rahimi*, 602 U.S. at 692, fn. 1; *Thacker*, 2024-Ohio-5835, at ¶ 12, fn. 1 (1st Dist.); *Brown*, 2025-Ohio-8, at ¶ 21 (1st Dist.). The Ohio Supreme Court has recently taken

16

jurisdiction of an appeal posing just this question. *See State v. Striblin*, 2024-Ohio-2142 (5th Dist.), *appeal accepted*, 2024-Ohio-4713. We, however, once again find its resolution unnecessary. Regardless of which date should serve as the fulcrum of *Bruen*'s analysis, we conclude that the antebellum sources sufficiently illuminate the Amendment's public meaning.

**{¶45}** If the relevant date is 1868, then the relevance of antebellum materials is simple: the 19th-century statutes and cases would have been the backdrop against which the ratifiers chose to incorporate the Second Amendment through the Fourteenth. *See* Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind.L.J. 1439, 1441 (2022)[2] ("When the people adopted the Fourteenth Amendment, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings.").

**{¶46}** But even if 1791 is the focus of our inquiry, *Bruen* suggests that these 19th-century materials are still relevant. At bottom, our task under *Bruen* is to determine the scope of the right to bear arms as that right was understood by the relevant ratifying public. Even where the evidence of preratification legislation is slight, we may look to evidence of how a Constitutional provision was understood *following* its ratification to shed light on an ambiguous text's original meaning. *See*

---

[2] Available at https://www.repository.law.indiana.edu/ilj/vol97/iss4/7.

*Bruen*, 597 U.S. at 35-36; *Heller*, 554 U.S. at 605.[3]

**{¶47}** Here, we have an ambiguous text. The phrase "bear arms" *could* encompass "the right to 'wear, bear, or carry . . . *upon the person or in the clothing or in a pocket*, for the purpose . . . of being armed and ready for offensive or defensive action.'" (Emphasis added.) *Bruen* at 32, quoting *Heller* at 584. But this plain-text definition describes all the right *could* encompass, not all it *did* encompass. *Bruen* clearly thought so—it cited the above-quoted definition as part of its step-one analysis, but nevertheless proceeded to examine postenactment materials to discern how the right was actually *understood*.

**{¶48}** *Bruen* and *Heller* found antebellum firearms laws important for understanding the original meaning of the scope of the right to keep and bear arms. *See Heller* at 610-614 (examining "19th-century cases that interpreted the Second Amendment"); *Bruen* at 52-55 (reviewing antebellum statutory restrictions on public carry). In doing so, the *Bruen* court weighed these antebellum sources based on their distance from 1791 and their conformity to larger trends and traditions in considering the meaning of the Second Amendment. For example, the Court held that an 1860 law

---

[3] An original-public-meaning analysis asks what the ratifiers understood themselves to be voting on at the moment they voted on a particular provision. *See* DeWine, *Ohio Constitutional Interpretation*, 86 Ohio State L.J. (Forthcoming 2025), available at https://ssrn.com/abstract=4986929 (Oct. 24, 2024 draft) ("Under this framework, a constitutional provision has the meaning that would have been accessible to a member of the public at the time of its adoption."). Those who ratified the Second Amendment obviously could not have based their views about its meaning on decisions not yet rendered or laws not yet passed. Thus, postratification materials cannot serve as *direct* evidence of a provision's original public meaning, and we must "guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35. But when the ratifiers enshrined a term whose meaning is *ambiguous*, and when preratification materials do not readily fix that ambiguous term's meaning, courts, scholars, and founders alike have acknowledged the vital role that postratification decisions and practice can play in clarifying it. *See Bruen* at 36, citing Baude, *Constitutional Liquidation*, 71 Stan.L.Rev. 1 (2019), available at https://www.stanfordlawreview.org/print/article/constitutional-liquidation/; *see also The Federalist*, No. 37 (James Madison) ("All new laws, though penned with the greatest technical skill, and passed on the fullest and most mature deliberation, are considered as more or less obscure and equivocal, until their meaning be liquidated and ascertained by a series of particular discussions and adjudications."); *NLRB v. Noel Canning*, 573 U.S. 513, 524-526 (2014).

for the Territory of New Mexico banning the carrying of all pistols "concealed or otherwise" was "an outlier statute enacted by a territorial government nearly 70 years after the ratification of the Bill of Rights, [whose] constitutionality was never tested in court." *Id.* at 55, fn. 22 discussing 1860 Terr.N.M.Laws 94, § 1-2. It therefore found the statute to have limited "value in discerning the original meaning of the Second Amendment." *Id.* But the rejection of this law strongly suggests that the earlier 19th-century CCW statutes *were* valuable to the Court's analysis.

{¶49} We likewise conclude that the antebellum and related 19th-century materials emphasized in *Bruen* and *Heller* offer valuable insight into the original public understanding of the right to bear arms, both at the time the Second and the Fourteenth Amendments were ratified. Whatever year *Bruen* felt to be the lodestar of its constitutional analysis, these materials were vital to its inquiry. In the absence of relevant, affirmative evidence from the years immediately surrounding 1791 demonstrating that the preexisting right to bear arms prevented or permitted the enactment of concealed-carry restrictions, these antebellum sources are likely our best means of gleaning whether the ratifying generation viewed "the right of the People to keep and bear arms" to include the right to bear them *concealed*.

{¶50} We therefore proceed to address the very antebellum statutes considered in *Bruen*, looking principally for consistent trends, understandings, and responses that span the period from the first such state law (1813) to the last of these antebellum state statutes (1859). We begin with the states that enacted straightforward CCW prohibitions during this period, before turning to the decisions assessing those statutes' constitutionality, and then finally turning to several related public-carry limitations enacted in other states.

b. Antebellum CCW Statutes

**{¶51}** In *Bruen*, the Court identified ten states or territories that, during the antebellum period, enacted statutes to restrict the carrying of weapons in public. *Bruen*, 597 U.S. at 52, fn. 16. Seven of these states specifically targeted the carrying of concealed firearms. The first two concealed-carry statutes were both passed in 1813, when (1) Kentucky banned the carrying of concealed "pocket pistol[s]" and select bladed weapons, Act of Feb. 3, 1813, 1813 Ky.Acts 100, Ch. 89,[4] and (2) Louisiana prohibited the carrying of "any . . . deadly weapon concealed . . . that is not in full open view," Act of Mar. 25, 1813, 1813 La.Acts. 172.[5] Over the next half-century, five other states would prohibit the carrying of concealed pistols (or concealed weapons generally): (3) Indiana, Act of Jan. 14, 1820, 1820 Ind.Acts 39, Ch. 23,[6] (4) Florida, Act of Jan. 6, 1847, 1846 Fla.Acts 20, Ch. 75 [No. 5], § 3,[7] (5) Arkansas, Ark.Rev.Stat., Ch. 44, Div. 8, Art. 1, § 13 (1838),[8] (6) Alabama, Act of Feb. 2, 1839, 1839 Ala.Acts 67, No. 77, § 1,[9] and (7) Ohio, Act of Mar. 18, 1859, Section 1, 56 Ohio Laws 56.[10] These concealed-carry laws shared several common features, as well as salient differences.

**{¶52}** *First*, as already noted, these statutes prohibited individuals from carrying concealed pistols or deadly weapons more generally. Louisiana prohibited any person from having a "concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon concealed in his bosom, coat or in any other place about him

---

[4] Available at https://hdl.handle.net/2027/iau.31858018298855?urlappend=%3Bseq=98.

[5] Available at https://lasc.libguides.com/ld.php?content_id=67453991.

[6] Available at https://archive.org/details/isl-ind-gov-acts-1820/page/n19.

[7] Available at https://archive.org/details/actsofgen46flor/page/20. While *Bruen* did not cite this particular Florida statute, it did cite an even earlier Florida territorial law. *See Bruen*, 597 U.S. at 52, fn. 16, citing Act of Jan. 30, 1835, 1835 Terr.Fla.Acts 318, Ch. 860 [No. 33], available at https://archive.org/details/actsoflegis35flor/page/318. This territorial law was effectively reenacted in the post-statehood statute cited above, which *Bruen* omitted.

[8] Available at https://hdl.handle.net/2027/nyp.33433009077029?urlappend=%3Bseq=304.

[9] Available at https://archive.org/details/alabama-acts-1838-1839/Acts_1838_1839/page/n66.

[10] Available at https://archive.org/details/actsstateohio44statgoog/page/n61.

that do not appear in full open view." 1813 La.Acts at 172. Indiana's 1820 prohibition was similar. *See* 1820 Ind.Acts at 39 (forbidding any person to "wear[] any dirk, pistol, sword in cane, or any other unlawful weapon concealed"). The laws of the territory of Florida declared more generally that "it shall not be lawful for any person in this Territory, to carry arms of any kind whatsoever secretly, on or about their persons." Act of Jan. 30, 1835, 1835 Terr.Fla.Acts 318, Ch. 860 [No. 33]. And Kentucky's CCW law did not even include all concealed pistols, instead punishing only those who "w[ore] a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon." 1813 Ky.Acts at 100.

{¶53} *Second*, as the excerpts above suggest, these statutes singled out the carrying of *secret* or *concealed* weapons, as opposed to the open carrying of firearms. Florida, for example, made this distinction doubly clear by not only prohibiting persons from "carry[ing] arms of any kind whatsoever secretly," but also emphasizing that its statute should "not be so construed as to prevent any person from carrying arms openly, outside of all their clothes." 1835 Terr.Fla.Acts at 318; *accord* 1846 Fla.Acts at 21.

{¶54} *Third,* these CCW laws were penal in character, and most punished noncompliance "with significant criminal penalties," not merely with "small fine[s] and forfeiture of the weapon." *See Heller*, 554 U.S. at 633. Except for Kentucky and Indiana, these CCW schemes threatened jail time—in some cases up to six months. *See, e.g.*, Ark.Rev.Stat., Ch. 44, Div. 8, Art. 1, § 13 (1838) (one to six months); 1835 Terr.Fla.Acts at 318 (one to six months); 1846 Fla.Acts at 20 (ten days to six months). And *all* imposed fines—some with caps that were relatively low, *e.g.*, 1820 Ind.Acts at 39 ("any sum not exceeding" $100), and others that were quite high (in 19th-century dollars), *e.g.*, 1839 Ala.Acts at 67 ($50-$500); 1846 Fla.Acts at 20 ($5-$500).

**{¶55}** *Fourth*, these laws differed with respect to whether and what sorts of conduct they exempted from their general CCW prohibitions. The most common exceptions were made for "travellers"[11] or persons "on a journey," as in the statutes passed by Kentucky, Indiana, and Arkansas. *See* 1813 Ky.Acts at 100 ("unless when travelling on a journey"); 1820 Ind.Acts at 89 ("[T]his act shall not be construed as to affect travellers."); Ark.Rev.Stat., Ch. 44, Div. 8, Art. 1, § 13 (1838) ("unless upon a journey"). Ohio offered a very different exception by providing an affirmative defense for persons "engaged in the pursuit of any lawful business, calling, or employment," who were confronted with "circumstances . . . such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person." 56 Ohio Laws at 56-57. Louisiana, Alabama, and Florida, meanwhile, provided no significant statutory exceptions, except that Florida's statutes exempted "common pocket kni[ves]." *See* 1835 Terr.Fla.Acts at 318; 1846 Fla.Acts at 20-21; *see also* 1813 La.Acts at 172, 174; 1839 Ala.Acts at 67.

### c. Judicial Decisions on CCW Statutes

**{¶56}** Statutes in five of these seven states (Louisiana, Indiana, Alabama, Arkansas, and Ohio) were upheld by their respective state high courts, while one state's CCW statute (Kentucky's) was struck down, and another's (Florida's) appears never to have been challenged.

**{¶57}** The earliest case, and the only one to declare CCW restrictions invalid, came out of Kentucky. In *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822), the

---

[11] Many of the quotations from historical sources employ the British spellings of words, which we have left unaltered and unnoted. Where not quoted, however, we employ the modern, American spellings.

Kentucky Court of Appeals, in a split decision,[12] held Kentucky's CCW statute unconstitutional under its state constitution. The court conceded that the statute prohibited only carrying weapons concealed and was therefore not an "entire destruction of" the right to bear arms in self-defense. *Id.* at 91. Nevertheless, it concluded that, "if any portion of that right be impaired, immaterial how small the part may be, and immaterial the order of time at which it be done, it is equally forbidden by the constitution." *Id.* at 93. Further, the court held that the ability to exercise the defendant's right to carry weapons openly did not save the statute. *Id.* at 92-93. Under such a view, it said, a once-constitutional CCW law might suddenly become unconstitutional, should the legislature subsequently prohibit open carry. The court rejected such a result as "absurd," asserting that a law "consistent with the constitution" when enacted "cannot then become otherwise by any subsequent act of the legislature." *Id.*

**{¶58}** No subsequent court appears to have accepted these theories, including Kentucky's neighbor, Indiana. Eleven years after *Bliss*, in *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833), Indiana's Supreme Court of Judicature rejected a challenge to Ind.Rev.Laws, Ch. 26, § 58 (1831),[13] which had effectively codified that state's 1820 CCW statute. The court did not explain its decision, however. The entire opinion read, "IT [sic] was held in this case, that the statute of 1831, prohibiting all persons, except travellers, from wearing or carrying concealed weapons, is not unconstitutional."

---

[12] While the dissent in *Bliss* is only briefly noted in the body of the majority's opinion, other courts of the period commented on the decision's split character. *See Bliss*, 12 Ky. (2 Litt.) at 94 ("such is the conviction entertained by a majority of the court, (Judge Mills dissenting,) in relation to the act in question"); *see also State v. Reid*, 1 Ala. 612, 620 (1840) ("Without further noticing the case of Bliss v. Commonwealth, it may be proper to remark, that it received the assent of but two of the judges of the court of appeals, while it was dissented from by the third." (Formatting sic.)); *Nunn v. State*, 1 Ga. 243 (1846) ("Bliss appealed to the Supreme Court, by a majority of which (Judge Mills dissenting) the judgment was reversed.").

[13] Available at https://archive.org/details/revisedlawsofind00indi/page/192.

*Mitchell* at 229.

{**¶59**} Both Alabama's and Louisiana's high courts, too, upheld their states' CCW regimes, albeit with somewhat different rationales. Alabama upheld the statute, in essence, as a legitimate regulation on the *manner* in which an individual may "bear arms" in *State v. Reid*, 1 Ala. 612 (1840). It reasoned that a citizen's right to bear arms enshrined in the Alabama constitution was the right "not to bear arms upon all occasions and in all places, but merely 'in defence of himself.'" *Id.* at 614-615, quoting former Ala. Const. art. I, § 23. Thus, the state retained the power to regulate the manner in which an individual bore arms, so long as its regulation did not, "under the pretence of regulating, amount[] to a destruction of the right, or . . . require[] arms to be so borne as to render them wholly useless for the purpose of defence." *Id.* at 616-617.

{**¶60**} The Louisiana Supreme Court, however, rested its decision not on a distinction between regulation and destruction of the right, but on the rationale that the Second Amendment protected only the carrying of weapons "'in full open view.'" *State v. Chandler*, 5 La.Ann. 489, 489 (1850), quoting 1813 La.Acts at 172. While open carry "incite[d] men to a manly and noble defence of themselves, if necessary, and of their country," the court said, concealed carry served primarily to enable "secret advantages and unmanly assassinations," at odds with the purposes of the right. *Id.* The Louisiana Supreme Court twice reiterated this conclusion. *See State v. Smith*, 11 La.Ann. 633, 633 (1856) (noting that concealed weapons are employed "most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke"); *State v. Jumel*, 13 La.Ann. 399, 399-400 (1858).

{**¶61**} As this last quotation suggests, however, the Alabama and Louisiana

Supreme Courts were not so split on rationale as they initially appeared. The Alabama court, in explaining why that state's CCW statute had not transgressed the right of armed self-defense, explained that "it is only when carried openly, that [firearms] can be efficiently used for defence." *Reid* at 619. And the Louisiana Supreme Court, in its third CCW opinion, sounded like its Alabama analogue when it explained that Louisiana's CCW law did "not infringe the right of the people to keep or bear arms" because it "prohibit[ed] only a *particular mode* of bearing arms which is found dangerous to the peace of society." (Emphasis sic.) *Jumel* at 399-400. At bottom, both courts centered their understanding of the right to bear arms on the central functions of that right: the carrying and use of weapons in legitimate defense of self and state. While that right remained unhindered, the legislature was free to regulate.

{¶62} The Supreme Courts of Arkansas and Ohio likewise upheld their states' respective CCW bans against state constitutional challenges. *See State v. Buzzard*, 4 Ark. 18 (1842); *State v. Nieto*, 101 Ohio St. 409 (1920). These decisions are of limited use in our *Bruen* analysis, however. The *Nieto* decision—which upheld Ohio's 1859 CCW law under the Ohio Constitution because it did "not operate as a prohibition against carrying weapons, but as a regulation of the manner of carrying them"—came over 50 years after the Fourteenth Amendment was ratified. *Nieto* at 413. And *Buzzard*, although it was penned much earlier and upheld Arkansas' CCW law, generated no majority rationale.

d.  Related Public-Carry Limitations

{¶63} In addition to the statutes in these seven states, several other statutes and decisions from antebellum Virginia, Tennessee, and Georgia inform our historical inquiry.

{¶64} Virginia's unique CCW statute punished only individuals who

25

"*habitually or generally*" carried weapons "hidden or concealed from common observation." (Emphasis added.) Act of Feb. 2, 1838, 1838 Va.Acts 76, Ch. 101, § 1.[14] Virginia courts treated this "habitually or generally" requirement as a substantive element of the offense, making this statute narrower than those already discussed. *See, e.g., Hicks v. Commonwealth*, 48 Va. 597, 598 (1850) (discussing from what evidence a jury could conclude that a defendant carried a concealed weapon "habitually or generally"). The act did not include an exemption for travelers or self-defense, and we have found no antebellum judicial opinions addressing its constitutionality.

**{¶65}** An 1837 Georgia law reached not only concealed weapons, but also weapons carried openly. *See* Act of Dec. 25, 1837, 1837 Ga.Acts 90, § 1[15] (forbidding any "person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere," any pistol, sword cane, spear, Bowie Knife or similar knife). No exception was made for travelers or self-defense, but the statute did exempt law-enforcement officers who carried arms while "in actual discharge of their respective duties," as well as those carrying certain types of knives and spears "openly," "externally," and "exposed plainly to view." *Id.* at 90, § 3. This last exception did not, however, apply to pistols.

**{¶66}** Georgia's law became the subject of a Georgia Supreme Court opinion, which the *Bruen* Court called "particularly instructive." *Bruen*, 597 U.S. at 54. In 1846, Hawkins Nunn was convicted under this law for carrying a pistol and sought a writ of error from the Georgia Supreme Court, arguing that Georgia's law violated the state and Federal Constitutions. *Nunn v. State*, 1 Ga. 243, 245 (1846). The state court concluded that, to the extent the act prohibited *both* the open *and* concealed carry of

---

[14] Available at https://archive.org/details/actsgeneralasse00virggoog/page/n80.
[15] Available at https://hdl.handle.net/2027/uc1.a0001994003?urlappend=%3Bseq=98.

pistols, it ran afoul of the Second Amendment.[16]

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

(Emphasis sic.) *Id.* at 251. Given that Nunn had "been indicted and convicted for carrying a pistol, without charging that it was done in a concealed manner, under that portion of the statute which entirely forbids its use," the court concluded that the trial court's judgment had to "be reversed, and the proceeding quashed." *Id.*

{¶67} Tennessee had a somewhat more complicated history of weapons-carry prohibitions. In 1821, the Tennessee legislature enacted what *Bruen* described as a "uniquely severe" carry restriction, *Bruen* at 54, which imposed a fine on "each and every person so degrading himself, by carrying a dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistols, either public or private," unless "on a journey to any place out of his county or state." Act of Oct. 18, 1821, 1821 Tenn.Acts 15, Ch. 13.[17] Although the firearms covered were limited to "belt or pocket pistols," the statute's language prohibited both open and concealed carry. The only exceptions made were for those who carried "a knife of any size in a conspicuous manner on the strop of a shot pouch," or who "may be on a journey to any place out of his county or state." *Id.*

---

[16] At the time *Nunn* was decided there was no Fourteenth Amendment, and the Bill of Rights had been held not to bind the states—a fact *Nunn* acknowledged. *See Nunn*, 1 Ga. at 250; *see also Barron ex rel. Tiernan v. Mayor & City Council of Baltimore*, 32 U.S. (7 Pet.) 243 (1833). Nevertheless, the *Nunn* court concluded that "[t]he language of the second amendment is broad enough to embrace both Federal and State governments," and held that, as applied to openly carried pistols, Georgia's statute violated that amendment. *Nunn* at 250-251.

[17] Available at https://heinonline.org/HOL/P?h=hein.ssl/sstn0222&i=14.

at 16.

**{¶68}** Then, in 1838, Tennessee toughened the penalties for carrying certain knives or blades (but not pistols) concealed, with no exception for travelers or self-defense. *See* Act of Jan. 27, 1838, 1838 Tenn.Acts 200, 200-201, Ch. 137, § 2[18] (imposing fines of $200-$500 and prison time of three to six months). Two years later, a defendant convicted under the 1838 act for concealing a Bowie knife challenged his conviction, arguing that it violated the right to bear arms enshrined in Tennessee's Constitution.[19] *Aymette v. State*, 21 Tenn. (2 Hump.) 154, 155-156 (1840). In rejecting his challenge, the Tennessee Supreme Court reasoned that "the right to *bear arms* is not . . . unqualified," and did not encompass the carrying of weapons "merely to terrify the people, or for purposes of private assassination." (Emphasis sic.) *Id.* at 160. Because "the manner in which they are worn, and circumstances under which they are carried, indicate to every man, the purpose of the wearer," the court held that "the legislature may prohibit such manner of wearing as would never be resorted to by persons engaged in the common defence." *Id.* The court also rejected the rationale offered by the Kentucky Court of Appeals in *Bliss*, as the Tennessee court saw "a *manifest* distinction" between carrying weapons openly and carrying them concealed. (Emphasis sic.) *Id.* A prohibition on open-carry would effectively ban the right to bear the military-style weapons protected under Tennessee's constitution, while "a prohibition to wear a spear concealed in a cane, would in no degree circumscribe the right to bear arms in defence of the State" or for "the common defence." *Id.* at 160-161. Indeed, the court even suggested that an individual who carried "a dirk or pistol

---

[18] Available at https://archive.org/details/esrp680529451/page/280.
[19] At the time, the Tennessee Constitution provided "[t]hat the free white men of this State, have a right to keep and bear arms for their common defence." *Aymette*, 21 Tenn. (2 Hump.) at 156; Tenn. Const., art. I, § 26 (1834), available at https://cdm15138.contentdm.oclc.org/digital/collection/tfd/id/489.

concealed under his clothes" could not be said to have "*borne arms*" within the meaning of the Constitution. (Emphasis sic.) *Id.* at 161.

**{¶69}** It was another 30 years before the court weighed in on Tennessee's pocket-pistol ban, which by then had added "revolver[s]" to its list of covered weapons. *See* Act of June 16, 1870, 1870 Tenn.Acts 28, Ch. 13, § 1.[20] By that point, the Tennessee Constitution had been amended as well and stated that "the citizens of this State have a right to keep and bear arms for their common defense. But the Legislature shall have power by law, to regulate the wearing of arms, with a view to prevent crime." Tenn. Const., art. I, § 26 (1870).[21] In *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 180-181 (1871), the Tennessee Supreme Court held that this provision did not provide the state with plenary power to prohibit the bearing of arms. Nevertheless, the court concluded that, as applied to weapons of a kind not regularly used in war, the public-carry ban was constitutional. *Id.* at 186-187. Thus, the court reversed the convictions and quashed the indictments in *Andrews* because they charged only "that the parties carried a pistol, without specifying the character of the weapon, whether belt or pocket pistol, or revolver." *Id.* at 192. This, the court said, was "too indefinite a charge"—the indictment needed to include some allegation that the weapon worn came within the statute's text and constitutional ambit. *Id.*; *see also Bruen*, 597 U.S. at 54 (discussing *Andrews*); *Heller*, 554 U.S. at 629 (same). But when the court addressed another defendant's conviction under the same act five months later, it affirmed, because there had been sufficient evidence that the defendant's revolver "was not such weapon as is

---

[20] Available at https://hdl.handle.net/2027/uc1.b3693023?urlappend=%3Bseq=68. The 1870 statute also added a new exemption for law-enforcement officers to the 1821 exemption for certain persons on a journey. 1870 Tenn.Acts, Ch. 13, § 3, at 29.

[21] Available at https://cdm15138.contentdm.oclc.org/digital/collection/tfd/id/560. This language appears to have been introduced as part of Tennessee's Reconstruction Constitution of 1870, which, though amended, remains the basis for Tennessee's current constitution.

used as a weapon of war." *Page v. State*, 50 Tenn. (3 Heisk.) 198, 200 (1871).[22] It also read a mens rea requirement into the statute. *Id.* at 201. ("To constitute the carrying criminal, the intent with which it is carried must be that of going armed, or being armed, or wearing it for the purpose of being armed.").

**{¶70}** Tellingly, after *Andrews* was decided, the Tennessee legislature amended the 1870 statute to expressly permit individuals to openly carry pistols "such as are commonly carried and used in the United States Army," while simultaneously forbidding them to "carry such army pistol . . . in any *other manner than openly in his hands.*" (Emphasis added.) Act of Dec. 14, 1871, 1871 Tenn.Acts 81, Ch. 90, § 1.[23] The Tennessee Supreme Court upheld this restriction on the concealed carry of army-style weapons, reasoning that it "was not an absolute prohibition of the carrying or wearing of this weapon, as it recognizes the right to carry it openly in the hands." *State v. Wilburn*, 66 Tenn. (7 Baxt.) 57, 61-62 (1872).

### 3. Application

**{¶71}** Are Ohio's CCW restrictions "relevantly similar" to these historical laws, and therefore within the "historical tradition that delimits the outer bounds of the right to keep and bear arms"? *See Bruen* at 19, 29. To answer this question, we look to "[w]hy and how the regulation burdens the right." *Rahimi*, 602 U.S. at 692. Because we find the latter question the more significant hurdle, we address it first.

### a. The "How"

**{¶72}** Ohio's law "burdens" Hall's presumptive "right" by limiting the manner in which he may carry a weapon. Under Ohio law, Hall *could have* carried his weapon

---

[22] The entire *Page* opinion appears in a footnote to *Andrews* and does not appear to have ever been published separately. The relevant note begins on 50 Tenn. (3 Heisk.) 198.
[23] Available at https://hdl.handle.net/2027/uc1.b3693025?urlappend=%3Bseq=87.

openly, notwithstanding his pending negligent assault charge; it was Hall's decision to carry his weapon concealed that the State sought to punish. We therefore ask whether the historical materials discussed above demonstrate a relevant history of similar restrictions on carrying concealed weapons. Based upon the following considerations, we hold they do.

**{¶73}** *First*, 10 of the 34 antebellum states enacted prohibitions on carrying some concealed or concealable firearms, suggesting that these legislatures believed such regulations within their competence. Of these ten states, eight (Kentucky, Louisiana, Indiana, Florida, Virginia, Arkansas, Alabama, and Ohio) only restricted *concealed* firearms. The two others (Georgia and Tennessee) prohibited *both* open *and* concealed carry, but limited their statutes to certain concealable firearms. *See* 1837 Ga.Acts at 90, § 1 and 4 (prohibiting open carry of pistols and sword canes, while allowing open carry of various knives and spears); 1821 Tenn.Acts at 15-16 (prohibition on publicly carrying dangerous concealable knives and "belt or pocket pistols" but exempting knives carried "in a conspicuous manner on the strop of a shot pouch"); 1870 Tenn.Acts at 28 (prohibiting public carry of any "belt or pocket pistol or revolver"). These ten antebellum legislatures, at least, did not understand any preexisting right to bear arms or constitutional provision to prohibit them from regulating the carrying of concealed or easily concealable weapons.

**{¶74}** *Second*, nearly all state high courts to consider these antebellum laws agreed that legislatures could regulate the carrying of concealed weapons. The Supreme Courts of Alabama and Louisiana, for example, upheld their states' CCW laws because they were limited to concealed weapons, leaving parties free to carry weapons openly. *See Reid*, 1 Ala. at 614-616; *Chandler*, 5 La.Ann. at 489; *Jumel*, 13 La.Ann. at 399-400; *see also Nieto*, 101 Ohio St. at 413 ("The statute does not operate as a

prohibition against carrying weapons, but as a regulation of the manner of carrying them. The gist of the offense is the concealment.").

**{¶75}** *Third*, the state court decisions addressing the constitutionality of these statutes reveal the rationale underpinning the consensus view: "that concealed-carry prohibitions were constitutional . . . if they did not similarly prohibit *open* carry." (Emphasis sic.) *Bruen*, 597 U.S. at 53. Like the Court in *Bruen*, the antebellum legislatures understood the right to bear arms as the "right to bear arms in public *for self-defense.*" (Emphasis added.) *Id.* at 70. Thus, the antebellum state courts upheld regulations on the manner in which arms could be carried, so long as those arms could be kept readily available for self-defense. The Alabama Supreme Court explained that, while the state *could* "inhibit[] the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer," it could *not* "under the pretence of regulating," enact a law that would "amount[] to a destruction of the right, or . . . require[] arms to be so borne as to render them wholly useless for the purpose of defence." *Reid* at 616-617. The Georgia Supreme Court likewise upheld that state's public-carry ban as applied to concealed carry, because such a regulation on the manner of carrying arms would "not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms." (Emphasis sic.) *Nunn*, 1 Ga. at 251. The Tennessee Supreme Court drew a similar line concerning protected, military-style handguns. *Compare Andrews*, 50 Tenn. (3 Heisk.) at 187-188 (holding that prohibition on carrying military-style weapons in public was too broad), *with Wilburn*, 66 Tenn. (7 Baxt.) at 61-62 (upholding new statute "recogniz[ing] the right to carry [military-style pistols] openly in the hand," because it was "not an absolute prohibition of the carrying or wearing of this weapon").

**{¶76}** *Fourth*, even when the Tennessee Supreme Court *upheld* total bans on

the carrying of certain weapons, it did so only after determining that those weapons fell outside the scope of the constitutional right to bear arms in public. Thus, the *Andrews* court upheld a ban on publicly carrying pocket or belt pistols, but held that the same could not constitutionally be applied to certain military-style weapons. *Andrews* at 187. The military-style guns, the court concluded, were within the right protected by the state's constitution, while the smaller belt and pocket pistols fell outside the scope of the right. *Id.* at 186.[24]

**{¶77}** *Fifth*, while we have described the significant positive evidence of the states' historical power to impose CCW restrictions, no party has offered evidence that any antebellum legislature considered and declined to adopt such a restriction on constitutional grounds. This bolsters the argument that the cited decisions and statutes represented a commonly held understanding of the scope of the right to bear arms. *See Bruen* at 27 (noting that, "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality").

**{¶78}** *Sixth,* the parties cite only one judicial decision—*Bliss*—that held a CCW prohibition wholly unconstitutional. But *Bliss* was a split decision, and its reasoning was rejected or distinguished by the other antebellum courts to consider the issue. *See,*

---

[24] The conclusion that such small handguns receive less protection may not survive *Heller* and *Bruen*'s analysis of handgun rights under the Second Amendment. *See Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."); *Bruen*, 597 U.S. at 47, quoting *Heller* at 629 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'"). Nevertheless, the basic rationale for why such regulations were permissible—i.e., that the state could prohibit all carrying of unprotected weapons, but could regulate only the manner of carrying protected arms—remains instructive, even if the Tennessee court's analyses of *which* weapons were protected does not.

*e.g., Reid*, 1 Ala. at 617-620 (distinguishing protections described in the text of the Alabama and Kentucky constitutions, and rejecting *Bliss*'s argument that a constitutional law cannot be rendered unconstitutional by subsequent enactment); *Aymette*, 21 Tenn. (2 Hump.) at 154 (noting the *Bliss* decision but concluding that the court could not concur with it); *Nunn*, 1 Ga. at 247-248 (describing the *Bliss* decision but ultimately upholding Georgia's public-carry ban as applied to CCW); *see also* Halbrook, *The Common Law and the Right of the People to Bear Arms*, 7 L.M.U.L.Rev. 40, 65-67 (2020)[25] (discussing *Bliss* and subsequent contrary decisions); Baude & Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L.Rev. 1467, 1474 (2024) ("*Bliss* was an outlier decision—a decision that did not correctly state the general law."); *Commonwealth v. Murphy*, 166 Mass. 171, 173 (1896) (noting that CCW provisions had generally been upheld and "[t]he early decision to the contrary of *Bliss v. Commonwealth* . . . has not been generally approved").

**{¶79}** Based upon the foregoing, we conclude that, throughout our nation's history, legislatures maintained the power to limit or prohibit the carrying of concealed weapons and to enforce such prohibitions with criminal penalties. This power was limited, however, by the individual's right to bear arms in self-defense. As *Bruen* held, individuals historically had a right to carry arms covered by the Second Amendment in public places. If they had a right to carry weapons in public, then they had the right to keep those weapons reasonably accessible to defend themselves. Legislatures were free to regulate the *manner* in which such protected weapons had to be carried, so long as, in doing so, they did not render the weapon unusable for this

---

[25] Available at https://digitalcommons.lmunet.edu/lmulrev/vol7/iss1/3/.

essential purpose.

**{¶80}** In this case, we consider Ohio's CCW regime as applied to Hall, who is prohibited from carrying a concealed weapon (i.e., an individual who is not a "qualifying adult" under R.C. 2923.111(A)(2)), but who is permitted to possess and carry a weapon openly (i.e., an individual without a legal "disability" under R.C. 2923.13(A)). Because Hall could carry his weapon openly, and because there is no reason to believe that carrying his weapon openly would have disabled Hall from defending himself, should the need have arisen, we hold that Ohio's modern CCW regime burdened Hall's ability to keep and bear arms in a manner directly analogous to the way in which the historical CCW laws did.

### b. The "Why"

**{¶81}** Having concluded that Ohio's CCW ban uses historically-grounded means to restrict Hall's right to bear arms, we now ask whether its reason for that restriction stands on equally historical ground.

**{¶82}** We hold that it does. Ohio's CCW law regulates arms-bearing for the same basic reason that the antebellum states did: to reduce individuals' ability to ambush or surprise those around by attacks with hidden weapons.

**{¶83}** Many of the antebellum courts and legislatures made the purposes behind their enactments abundantly clear. As the legislative preamble to Louisiana's 1813 law described it, that state's CCW law was necessary to staunch the tide of "assassinations," which the legislature attributed, "in a great measure . . . to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons." 1813 La.Acts at 172. The Louisiana Supreme Court described the law as necessary to counteract the "vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed

35

upon unsuspecting persons." *Chandler*, 5 La.Ann. at 489-490. And, in a subsequent opinion, that court further explained how concealed weapons were "used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke." *Smith*, 11 La.Ann. at 633. The Tennessee Supreme Court suggested that there was no defensive reason for needing to conceal one's arms; doing so would only be necessary, it surmised, "for purposes of private assassination." *Aymette*, 21 Tenn. at 160. Similarly, the Alabama Supreme Court struggled to conceive of a situation in which wearing arms concealed, rather than openly, would be necessary for self-defense. *Reid*, 1 Ala. at 621-622.

{¶84} A post-Civil War decision put the purpose behind concealed carry bans most plainly: "that those associating with the bearer may guard against injury by accident or otherwise." *Carroll v. State*, 28 Ark. 99, 101 (1872). This is likely why Justice Dickinson described Arkansas's concealed-carry regulation "as the exercise of a power loudly called for by our citizens, and which, if strictly enforced by the public authorities, would add greatly to the peace and good order of society, the security of our citizens at home and the reputation of the State abroad." *Buzzard*, 4 Ark. at 33 (opinion of Dickinson, J.).

{¶85} Put simply, those who carried concealed weapons posed a bigger risk. Not all individuals carried concealed weapons for ill intents—this much can be seen from some legislatures' exceptions for travelers or other groups—but many individuals with ill intent preferred to carry concealed. Concealed carry is not "dangerous" in its own right; it is dangerous because bad actors are likely to be more brazen or dangerous if they can hide that they are armed. Restricting concealed carry, therefore, restricts such bad actors' ability to surprise their unsuspecting targets and to strike without fear

of quick reprisal. Thus, CCW laws served to disincentivize such mischievous practices, while preserving the right of armed self-defense.

**{¶86}** But which actors were good and which bad? The question was evidently difficult for antebellum legislatures to parse. So, to effectuate their desire to reduce the risk of such assassinations, they generally chose to prohibit the *act* of carrying concealed, rather than disabling particular individuals from doing so. They sometimes reticulated their schemes in slight ways, for example, by excusing travelers or law-enforcement officers. But, because the states, with only two exceptions, prohibited only *concealed* carry, the legislatures apparently felt no compulsion to tailor their laws any further. They allowed citizens to retain their ability to carry weapons openly, which "placed men upon an equality," *Chandler*, 5 La.Ann. at 490, and effectively preserved their "*natural* right of self-defence." (Emphasis sic.) *Nunn*, 1 Ga. at 251. Such laws imposed only negligible burdens upon individuals whose aims were purely defensive, for, "[i]f the emergency is pressing, there can be no necessity for concealing the weapon." *Reid*, 1 Ala. at 621.

**{¶87}** We therefore conclude that the purpose behind our nation's history of CCW laws was to reduce the risk of surprise attacks from hidden weapons, while leaving untouched the right to carry openly for self-defense.

**{¶88}** Ohio's purpose, as manifest in its current CCW legislation, is the same. Ohio permits open carry for most of its citizens, and it permits concealed carry for a somewhat smaller number. Hall falls into the former category, but not the latter. Hall may possess a weapon and carry it openly, but he may not carry it concealed.

**{¶89}** In its brief, the State contends that the legislature has identified certain groups of people as posing a greater-than-average danger with a concealed weapon, but not so great a danger that they must be prohibited from "the ownership, possession

and reasonable use of weapons." *See State v. Beasley*, 1982 Ohio App. LEXIS 11857, *5 (1st Dist. Jan. 27, 1982). Our history and tradition reveal that legislatures were free to prohibit such persons from carrying concealed—indeed, to prohibit each and every person from doing so—for the same basic purpose the State prohibits Hall from carrying concealed today: to reduce the number of surprise shootings and to put individuals around the arms-bearer on notice of the dangerous weapon they carry.

{¶90} Because Ohio's law restricts Hall's right to carry concealed firearms for the same reason that, for example, Louisiana restricted *all persons'* ability to do so in 1813, we conclude that the reason for the State's law matches that of its historical antecedents. Under *Bruen*, we are not meant to weigh the government's interest, but merely to consider whether its regulatory rationale is analogous to that of legislatures past. Where a legislature could constitutionally apply a given prohibition to the whole of its population to assuage the same basic concerns, the fact that its modern counterpart is more porous (or, perhaps, more tailored) does not render that modern law suspect under the Second Amendment.

{¶91} As applied to individuals who remain legally allowed to carry firearms openly, Ohio's CCW statutes "impose a comparable burden on the right of armed self-defense" as that imposed by laws of the past. *See Bruen*, 597 U.S. at 29. The imposition of this modest burden "is comparably justified," then as now, by the need to reduce the number of individuals able to effect surprise attacks with hidden arms. *See id.* We therefore hold that the State's prosecution of Hall for carrying a concealed weapon did not infringe Hall's right to keep and bear arms protected by the Second Amendment.

### D. Our Barber Decision

{¶92} We recognize that the decision we reach today conflicts with a decision recently issued by a different panel of judges on this court, *State v. Barber*,

2025-Ohio-1193 (1st Dist.). We pause to explain why we do so.

**{¶93}** In *Barber*, a split decision, this court reversed a conviction for carrying a concealed weapon, where the defendant had been disqualified from carrying a concealed weapon by a prior delinquency adjudication for unlawfully carrying a concealed weapon. *Id.* at ¶ 3. Judge Zayas dissented, but not on the merits. *Id.* at ¶ 88 (Zayas, J., dissenting) (suggesting a reversal and remand for consideration of *Bruen* and *Rahimi*).

**{¶94}** The *Barber* majority held that the State had not met its burden on the "why" prong of the *Bruen/Rahimi* analysis, i.e., it had failed to show that the restriction on Barber's ability to bear arms had been for similar reasons to historically acceptable concealed-carry laws. *Id.* at ¶ 56 ("So while the government may impose restrictions on Barber's Second Amendment rights similar to restrictions imposed in historical laws, Ohio does not do so for 'similar reasons.'"). The majority "[a]ssum[ed], without deciding, that the historical laws cited by the State me[t] its burden to establish that *how* Ohio's CCW statute burdens Barber's Second Amendment right is 'relevantly similar' to our nation's history of firearms regulation." (Emphasis sic.) *Id.* at ¶ 44.

**{¶95}** In explaining its reason for holding that the State had failed to meet its burden on "the why," the *Barber* majority concluded:

> The State's historical evidence shows that states regulated one's ability to carry concealed weapons because the act was viewed as "cowardly" and dangerous. But by permitting most Ohio adults to carry concealed weapons, without having to take any steps to obtain a concealed-carry license, it is clear that Ohio has departed from the view that the simple act of carrying a concealed weapon is itself dangerous.

*Barber*, 2025-Ohio-1193, at ¶ 55 (1st Dist.).

**{¶96}** This is where we part ways with the *Barber* majority. We disagree that Ohio has departed from the view of concealed-carry underlying the historical concealed-carry laws in any relevant way. True, the historical materials describe the carrying of concealed weapons as "cowardly" and suggest that the practice multiplied the number of surprise shootings. But this was not because the antebellum legislatures considered the act of concealing a weapon *itself* to be dangerous. The problem with concealed carry was why someone would carry their arms concealed, and how doing so could increase the damage inflicted by bad actors.

**{¶97}** The Louisiana Supreme Court thought that concealed weapons were "used most frequently"—but not exclusively—"by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke." (Emphasis added.) *Smith*, 11 La.Ann. at 633. By such secrecy, these bad actors could accomplish ill ends, including "assassinations committed upon unsuspecting persons." *Chandler*, 5 La.Ann. at 489-490. Thus, for example, the Louisiana legislature could attribute the rise in "assassination and attempts to commit the same" to "the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going about the same armed in an unnecessary manner." 1813 La.Acts at 172.

**{¶98}** The problem these legislatures sought to address was not the inherent moral or physical harm inflicted by the decision to carry concealed weapons, but the risk that evil and cowardly people would use those concealed arms to ambush others and shoot them in the back. As the Arkansas Supreme Court put it in 1872, the carrying of concealed weapons deprived those in their proximity of the chance to take heed before things became deadly and enable them to "guard against injury by accident or

40

otherwise." *Carroll*, 28 Ark. at 101.

**{¶99}** In the antebellum period, this danger became so pervasive that some states felt the only remedy was *to ban concealed carry for all*. The sources describe the violence committed with such weapons in nearly epidemic terms. The Louisiana court described such a law as "absolutely necessary to counteract the vicious state of society, growing out of the habit of carrying concealed weapons," *Chandler* at 489-490, and Georgia's legislature, in the title to its CCW law, decried "the unwarrantable and too prevalent use of deadly weapons." 1837 Ga.Acts at 90.

**{¶100}** The severity of such broad-spectrum bans was tempered, however, by the relatively minor burden they imposed upon those carrying for legitimate reasons, like self-defense. But different states assessed the degree of danger and burden differently. The exceptions for travelers suggest that at least three states felt that those on a journey posed a lesser risk than locals. Ohio's law suggests that it considered those following a legitimate trade were likewise less prone to committing surprise attacks. Virginia felt that only habitual carrying of concealed weapons raised a red flag sufficient to trigger criminal charges. The specifics are less important here; the relevant fact is that, if the antebellum legislatures had thought that concealed carry itself was immoral and dangerous, it seems unlikely they would have included such varied and general exceptions. Like many things, CCW was banned because it was often used for ill, and rarely, if ever, necessary for good.

**{¶101}** Based on this historical evidence, we conclude that Ohio enacted its concealed-carry law for the same reason the antebellum legislatures did: to reduce the risk of surprise attacks and assassination from those who would use hidden weapons. And Ohio today, like the legislatures of the 19th century, is free to apply its CCW ban to all persons within its borders, or to some subset thereof.

{¶102} Thus, unlike in *Brown* and *Thacker*, "why" a state has enacted a CCW ban will not generally turn on *who* that ban targets. In *Thacker*, we probed the State's use of a drug-based delinquency adjudication as a proxy for dangerousness precisely because the State could not disarm such persons unless they were dangerous. *See Thacker*, 2024-Ohio-5835, at ¶ 54 (1st Dist.). Here, by contrast, history shows us that the State could have prohibited Hall from concealing his weapon as part of a law that prohibited *everyone* from doing so, as long as open carry remained available to him.

{¶103} Put simply, we believe Ohio's CCW prohibition regulates the bearing of firearms "for a permissible reason"—to reduce the risk of unwarned shootings with hidden weapons—and employs a regulatory scheme that does not go "beyond what was done" historically but instead stops short of the historical precedents. *See Rahimi*, 602 U.S. at 692. Because Ohio could prohibit all Ohioans from carrying concealed weapons to accomplish this basic goal, it may prohibit some of them from doing so.

{¶104} Nor do we agree with the *Barber* majority's intimation that the presence of a handful of statutes with exceptions meant that the State could not prohibit concealed-carry altogether. *See Barber*, 2025-Ohio-1193, at ¶ 42-43 (suggesting that "[u]sually, . . . historical concealed-carry prohibitions 'made exceptions for travelers passing through an area while armed'" and "often included exceptions for self-defense"). Contrary to *Barber*'s suggestion, the historical statutes before us suggest that only about half included any exception at all. Of the seven states that enacted straightforward concealed-carry bans before the outbreak of the civil war discussed above, only three included exceptions for "travellers" or those upon a journey. *See* 1813 Ky.Acts at 100; 1820 Ind.Act at 39; Ind.Rev.Laws, Ch. 26, § 58 (1831); Ark.Rev.Stat., Ch. 44, Div. 8, Art. 1, § 13 (1838). And only one state, Ohio, included a form of self-defense exception. 1859 Ohio Laws at 56-57, § 2. The other three states with such bans

42

included no similar exceptions. *See* 1813 La.Acts at 172; 1835 Terr.Fla.Acts at 318; 1846 Fla.Acts at 20, § 2; 1839 Ala.Acts at 612. Neither did an eighth state, Virginia—though travelers may have been unlikely to violate Virginia's prohibition on "habitually or generally" carrying weapons concealed. 1838 Va.Acts at 76, § 1. The two total-ban states were likewise split on exceptions. *Compare* 1821 Tenn.Acts at 16 (travelers exception), *and* 1870 Tenn.Acts at 29, § 3 (same), *and* 1871 Tenn.Acts at 82, § 3 (same), *with* 1838 Tenn.Acts at 200-201, § 1 and 5 (no travelers exceptions), *and* 1837 Ga.Acts at 90, § 4 (no travelers exception, but exception for law-enforcement).

{¶105} The even split among CCW laws in this respect dated back to the very first CCW laws in 1813. And the judicial decisions of the period either did not address the question of exceptions, or suggested they were not required. *See*, *e.g.*, *Reid*, 1 Ala. at 621-622 (avoiding the issue of whether a self-defense exception was required and doubting its necessity); *Carroll*, 28 Ark. at 100 (self-defense exception not required). The variability among the states regarding whether and which exceptions their statutes included, along with the absence of judicial concern on the topic, suggests that these were *policy determinations* left to the legislatures. In other words, Louisiana was just as competent to prohibit concealed carry by all persons—travelers and residents alike—as Indiana was to excuse travelers from its similar ban.

{¶106} That doesn't mean the State's rationale for giving some persons concealed-carry rights and not others is constitutionally irrelevant. In our view such concerns—including the under-inclusiveness concerns voiced by the *Barber* panel—raise Equal Protection questions, not Second Amendment ones. In the Equal Protection context, we ask whether the State has exercised its regulatory power improperly by drawing lines that are unreasonable, arbitrary, or downright invidious. While the weightiness of the State's regulatory interest and the under- or over-

inclusiveness of its legislative categories offer little insight into our nation's history and tradition of concealed firearms regulations, such considerations may affect the constitutionality of Ohio's CCW regime under the Equal Protection Clause. *Compare Rahimi*, 602 U.S. at 701, fn. 2 ("Many of the potential faults that the Fifth Circuit identifies . . . appear to sound in due process rather than the Second Amendment.").

{¶107} But *Bruen* was clear that such interest-balancing has no place in the Second Amendment analysis. "It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Bruen*, 597 U.S. at 26. Thus, our Second Amendment inquiry concerns the historical scope of the State's power to regulate arms-bearing, and of the individual's right to be free from such regulations.

{¶108} Where history shows that states had the power to prohibit all concealed carry, they certainly had the power to prohibit some of it. The Second Amendment, as defined and delimited by our history and tradition, sets a floor for gun rights. Legislatures may, by statute, grant their citizens *additional* gun rights beyond the Second Amendment's minimum, as Ohio has chosen to do for many in the concealed-carry context. But Ohio's decision to grant a *statutory* right to others cannot expand Hall's *constitutional* right to bear arms under the Second Amendment, just as Ohio could not contract the scope of that right by statute. *See Smith v. Arizona*, 602 U.S. 779, 794 (2024) (describing how "federal constitutional rights are not typically defined—expanded or contracted—by reference to non-constitutional bodies of law"); *see also California v. Greenwood*, 486 U.S. 35, 43-44 (1988).

{¶109} Courts have long-established frameworks for dealing with discriminatory laws under the Fourteenth Amendment. Importing those principles into the Second Amendment, however, risks obscuring *Bruen's* historical inquiry and

sowing jurisprudential confusion. Hall, like Barber, never raised an Equal Protection challenge, and we express no opinion on the merits of any under- or over-inclusiveness claim under the Equal Protection Clause. Because we believe *Barber* improperly introduced Equal Protection interest-balancing into the *Bruen* test, we respectfully disagree with its analysis.

\* \* \*

{**¶110**} Ordinarily Ohio courts—and this court especially—place great weight upon the doctrine of stare decisis to "provide continuity and predictability in our legal system," "thwart[] the arbitrary administration of justice," and "provid[e] a clear rule of law by which the citizenry can organize their affairs." *See Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 43. That principle is "of fundamental importance to the rule of law," and any departure from it "demands special justification." (Cleaned up.) *Id.* at ¶ 44.

{**¶111**} But *Barber* has hardly been around long enough to generate strong reliance interests. Thus, given (1) *Barber*'s recency, (2) the stark conflict between *Barber*'s reasoning and our own, and (3) the complexity and importance of the issues addressed by these cases, we believe that the principles of consistency, predictability, and clarity, all of which usually counsel in favor of stare decisis, would be better served by prompt en banc consideration. *See* App.R. 26(A)(2). We therefore decline to follow the course charted in *Barber*.

## IV. SECOND ASSIGNMENT OF ERROR: OHIO CONSTITUTIONAL CHALLENGE

{**¶112**} Also under his second assignment of error, Hall asserts that the CCW charge violated his "right to bear arms for [his own] defense and security" under Ohio's Constitution. Ohio Const., art. I, § 4. But the Ohio Supreme Court has already upheld Ohio's CCW regime under our state constitution. *See Klein v. Leis*, 2003-Ohio-4779,

¶ 15 ("We hold that R.C. 2923.12 does not unconstitutionally infringe the right to bear arms; there is no constitutional right to bear concealed weapons."). *Bruen* reshaped the landscape of Second Amendment law and undid many precedents interpreting the *federal* right to bear arms. But Ohio courts have long interpreted the arms-bearing provision in our own constitution as distinct from the analogous federal provision. *Bruen* did not alter *Klein*'s binding interpretation of our state constitutional protection, and so we reject Hall's state constitutional argument as decided by *Klein*.

{¶113} Because the trial court correctly denied Hall's motion to dismiss under both the state and federal constitutions, we overrule Hall's second assignment of error.

## V. CONCLUSION

{¶114} Because we hold that the trial court correctly denied both Hall's motion to suppress and motion to dismiss, we overrule his two assignments of error and affirm the judgment of conviction entered below.

Judgment affirmed.

**NESTOR** and **MOORE, JJ.,** concur.